Filed 9/23/13  P. v. Om CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C068420 |
| Plaintiff and Appellant, | (Super. Ct. No. CRF09109) |
| v. | |
| SAMOL SAM OM, | |
| Defendant and Appellant. | |

A jury found defendant Samol Sam Om guilty of inflicting corporal injury on a spouse (Pen. Code, § 273.5, subd. (a); counts 1 & 7; unless otherwise stated, statutory references that follow are to the Penal Code), assault by force likely to produce great bodily injury (§ 245, subd. (a)(1); count 2), assault with a knife (§ 245, subd. (a)(1); counts 3 & 8), child abuse or endangerment (§ 273a, subd. (a); count 4), misdemeanor child abuse or endangerment (count 5), criminal threats (§ 422; counts 9 & 11), misdemeanor vandalism (§ 594, subd. (b)(2)(A); count 10), and forcible dissuading a witness (§ 136.1, subd. (c)(1); counts 12 & 13).  The jury found that defendant personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)) in the commission of counts 3

1

and 8. It found him not guilty of a count of infliction of corporal injury on a spouse. (Count 6.) The trial court found that defendant had two prior serious or violent felony convictions (§§ 667, subds. (b)-(i), 1170.12) and had served a prior prison term (§ 667.5, subd. (b)). It found that counts 3, 8, 9, 11, 12, and 13 qualified for habitual criminal sentencing enhancements (five years for each prior serious felony conviction).

On counts 3, 4, 7, 8, 12, and 13 defendant was sentenced to prison for concurrent terms of 25 years to life. Counts 3, 8, 12, and 13 were enhanced by 10 years for two prior serious felony convictions. Counts 3 and 8 were enhanced by one year for weapon use. Counts 4 and 7 were enhanced by one year for a prior prison term. Concurrent terms of 180 days were imposed on counts 5 and 10. Sentences on counts 1, 2, 9, and 11 were stayed pursuant to section 654. In case No. 07-1997, a previously suspended prison sentence of six years four months was ordered to be executed consecutive to this case. Thus, the aggregate term in both cases was 42 years four months to life. The trial court did not pronounce any fines or fees. It requested that the probation department calculate presentence credits.

On appeal, the People contend: (1) the three strikes law required the trial court to impose consecutive sentences, (2) the court was required to impose sentence on counts 1, 2, 9, and 11 before staying execution of sentence under section 654, and (3) the court was required to impose mandatory fines and fees during its oral pronouncement of judgment. Defendant concedes the last two points.

In a cross-appeal, defendant contends (1) evidence of an uncharged act was admitted in error, and (2) the jury was not instructed on an element of forcibly dissuading a witness. We remand for further proceedings.

FACTS AND PROCEEDINGS

*Prosecution Case-in-Chief*

*October 2005 to May 2007: Background*

S.L. has two children, D.L. and S.P. In October 2005, while S.L. was in the process of divorcing the children's father, her sister S.R. introduced her to defendant. The pair married within two years.

As the marriage progressed, defendant's equanimity foundered. He had difficulty maintaining employment, and S.L. began supporting him. S.L. did not remember telling police that defendant began using cocaine or methamphetamine. However, defendant began consuming alcohol on a daily basis and became increasingly paranoid and violent with S.L. and her children. S.L. believed defendant was mentally ill. She thought treatment was the answer because defendant's behavior normalized when he was sober.

*November 2007: Counts 1, 2, and 3*

On November 3, 2007, defendant and S.L. got into a fight. The children were not around. Defendant punched and choked S.L. She could not breathe for a few seconds and thought she was going to die. Defendant also "slashed" S.L. with a knife, although she did not think he meant to cut her. He was "just thinking wrong." Defendant bandaged the wound for S.L. The wound left a scar on her arm. After the incident S.L. was "[b]lack and blue all over."

*Summer 2008: Count 4*

Because they did not have a kitchen table, the family dined on a mat on the floor. One day in summer 2008, S.L. left a bowl of hot soup on the floor. While drunk and angry, defendant kicked the bowl and the soup flew onto S.P., who was burned and scarred as a result. Defendant refused to let S.P. go to the hospital for treatment because he might get in trouble.

3

*October 2008:  Losing Custody of the Children*

Around October 2008, S.R. took custody of D.L. and S.P., which made defendant "go crazy."  S.R. had lost her job at a major retailer, and S.L. believed S.R. took the children because she wanted the child support payments that S.L. received from her ex-husband.  S.L. did not agree to give S.R. her children.  She thought it would be temporary; just a couple of days.  S.R. wanted them permanently and filed a request for child support.  S.L. was not concerned about the children's safety because defendant never hit them.  S.R. told S.L. that she would give up the guardianship if defendant and S.L. separated.

D.L. was interviewed the day before he left to live with S.R..  S.R. took D.L. to the interview and gave him a list of things to say.  D.L. was told that he was going to live with S.R. because it was not safe for him to stay with S.L. and defendant.  D.L. wanted to live with them to watch over his mother and protect her.  D.L. did not spend much time with S.L. during the four or five months he lived with S.R.

In S.L.'s opinion, had S.R. not taken the children, defendant would not have hit her.  S.L. believed that defendant went crazy after S.R. took the children.  She acknowledged that the children were living with her and defendant during some of the abuse.

*Before December 18, 2008:  Count 5*

S.L. did not believe that defendant hurt anyone on purpose.  Rather, "he was just being sick."  He "had mental illness."  For example, on one occasion, defendant was walking around the house.  "He was moving around all mad."  Defendant "accidentally" punched S.P. in the stomach.  S.P. cried a little, and defendant apologized.

S.P. described the incident differently.  She explained that she tried to separate defendant and S.L. as they argued.  Defendant punched or kicked S.P. in the stomach and she fell against a wall.  It hurt a little, but not very much.  S.P. did not think that defendant simply meant to push her aside.

4

*December 18, 2008:  Count 7*

A few days before a custody hearing for D.L., defendant and S.L. got into an argument.  Defendant had been drinking and became upset.  He thought that S.L. was sleeping around.  He also was upset that the children were gone and he was losing the family.  He became frustrated and punched S.L. in the mouth and ribs.  S.L. screamed, and S.P. entered the room.  S.P. was scared.  The punch left S.L. "black and blue," but eventually it faded away.  S.L. did not attend the guardianship hearing because she did not want anyone to see the bruise.

Later that day, defendant and S.L. were watching boxing.  He stood up and "just started pounding on" her, striking her left shoulder.  Afterward, he remarked, "that's post-traumatic stress," and walked out the door.  S.L. had a bruise on her arm for a week or so.  Defendant never apologized; instead, he denied that he had done anything.  "He was like somewhere else."

S.L. later reported this incident to West Sacramento Police Officer Rinaldo Monterrosa.  She said she had a bump from the incident, and she showed Monterrosa some bruises.  She told him defendant had punched her on the left side of her face, left shoulder, and left rib cage area.

*December 24, 2008:  Counts 8 and 9*

On December 24, 2008, defendant was upset that the children were gone and his life was falling apart.  He started drinking.  He looked out the window, noticed a car in the parking lot, and thought that someone was spying on them or that S.L. had sent someone to spy on him.

Defendant came at S.L. with a knife and tried to stab her.  He put the knife "real close" to her throat, about 12 inches away.  Defendant may have said, "I'm going to kill you," though S.L. could not remember.  S.L. was scared.  She cried and begged for mercy.

5

S.L. later reported this incident to Officer Monterrosa. She told him that defendant had seen a car outside their apartment. He accused S.L. of plotting against him and asked her who was in the car. Then he put a knife to her neck and said, "I'm going to kill you."

*May 2008 to January 2009: Count 10*

Defendant kicked and punched the walls of the couple's apartment, leaving holes that he repaired. According to S.L., defendant was "[j]ust mad. Mad at everything. Everything is gone." To D.L., defendant appeared to be relaxed after he punched or kicked the walls.

*January 6, 2009: Counts 11 and 12*

On January 6, 2009, defendant and S.L. went to a friend's house. Defendant had been drinking. Around 5:00 or 6:00 p.m., after they returned home, he started looking for his military knife. He became upset because he thought he had lost the knife. In fact, S.L. had hidden the knife because she was afraid that he again might do something to her. He got very angry and came at her with what she thought was a kitchen knife. She believed he was going to kill her, since the children were away. Defendant told S.L., "I'm going to kill you if I get locked up and you have something to do with it." Eventually, defendant calmed down and went to sleep.

S.L. later told Officer Monterrosa about this incident. She said that defendant had threatened to kill her. She also said her family was trying to end their relationship because defendant keeps hurting her. S.L. said that her children had seen a lot, which is the reason why they no longer were in the house. She also said that defendant no longer hits her; instead, he grabs the knife.

*January 7, 2009: Count 13*

When defendant awoke the next day, he told S.L. he was going to take out the garbage. He left the car keys and told her she could leave if she needed to cool off from their fight. S.L. saw that moment as her opportunity to leave. She thought defendant had

6

gone mad and would kill her if she did not flee. She drove to the police station and told Officer Monterrosa about several incidents of domestic violence.

Several family members, including S.P., met S.L. at the police department. Defendant arrived while everyone was there. According to S.P., defendant "said that if he was going to go to jail that he's going to make sure that something is going to happen to" the family members. Defendant said similar things when he and S.L. fought. A West Sacramento Police records clerk who was present behind a glass partition believed she had seen defendant mumble something, but she was not certain.

The parties stipulated that "if a representative from a drug testing laboratory were called to testify, that person would testify that a sample of blood taken from the defendant on January 7th, 2009, contained 0.02 nanograms per milliliter of methamphetamine." In Officer Monterrosa's experience, use of methamphetamine can cause erratic behavior, paranoia and mood swings.

The trial court took judicial notice of the fact that defendant had suffered a criminal threats conviction in 2007.

*Prior Uncharged Acts of Domestic Violence*

*1. Gun Incident*

When they lived in Stockton, defendant installed a surveillance system that had cameras to monitor each room. He had a gun. One time, defendant had S.L. and her children lie down on the ground. According to S.P., he pointed the gun at their heads. He told them to stay down and not move. Defendant seemed traumatized; S.L. and S.P. were scared. The trio remained on the floor for 10 to 15 minutes. S.P. waited for defendant to calm down and get back to normal. Apparently, defendant thought people were living on the roof and in the attic. He claimed he was trying to protect everyone.

*2. C.N. Incident*

On May 3, 2008, defendant, S.L., and S.P. went to Stockton for the birthday of defendant's mother, C.N. They stayed the night. While S.L. was sleeping, defendant

7

started "pounding" on her with his fists. She screamed for help and everyone rushed into the room. C.N. asked defendant why he was hitting S.L.. He got angry and punched C.N. in the jaw. She cried and ended up with a bruise on the left side of her chin.

When S.L. asked defendant why he struck her, defendant explained that his stepfather had fallen in love with another woman. Defendant mistakenly believed that S.L. was the woman his stepfather had fallen in love with. S.L. has a scar on her shoulder from the incident.

C.N. recalled the incident differently. C.N. recalled that she tried to leave the house around 5:00 a.m. Defendant was drunk. He asked her where she was going, and then he accidentally hit her. Defendant was pushing C.N.'s jaw and laughing at the same time. C.N. knew it was an accident because defendant was confused. He had been drinking all night. C.N. bruised, but only because she is diabetic. The police arrived around 6:00 a.m. C.N. told the police that defendant was drunk and had been drinking the entire night. She denied saying that defendant had been yelling at S.L. and harassing her. She also denied telling the police that she did not want defendant at her home and that he punched her. She did not tell an officer that the impact made her fall over. The police did not speak with her through an interpreter. Defendant did not tell C.N., "I didn't hit you, you hit yourself."

Around 9:44 a.m., Stockton Police Officer Dean Jacobs responded to a disturbance call and obtained a statement from C.N. C.N. had a bruise on the side of her face. According to Officer Jacobs, C.N. explained that she heard arguing in the area where defendant's wife and children were staying. She went to the area to break up the fight. Defendant got upset and hit her in the face. C.N. fell down, but she did not lose consciousness. Afterward, defendant said something like, "I didn't hit you; you hit yourself." Defendant left. C.N. said she did not want defendant at the house because there always were problems. C.N. said that defendant had been drinking the entire night.

8

### 3. *Threat to burn down the apartment*

One morning in the summer of 2008, around 2:00 or 3:00 a.m., defendant came home drunk and angry. He thought that someone was inside the apartment. Defendant kicked the door of the bedroom where S.L. and S.P. were sleeping. He lit an oil container and said that he was going to burn down the apartment. S.L. screamed at defendant, and he stopped.

### 4. *Striking S.L.'s head with a telephone*

On another occasion, when defendant and S.L. were driving around looking for D.L., defendant struck S.L.'s head with a telephone, causing her head to bleed. Afterward, S.L. went to her parents' house.

### 5. *Shooting D.L. with a paintball gun*

D.L. testified that, on one occasion while he was in the rear seat of a car, defendant shot him in the arm with a paintball gun. The impact left a bruise that lasted for a couple of days.

S.P. recalled the incident differently. She explained that, during a fishing trip, defendant retrieved the paintball gun from the car and fired it at D.L. four times, hitting him once in the leg. They were not playing paintball at the time. Defendant also shot himself in the leg.

*Expert Testimony on Domestic Violence*

An expert testified on general issues of domestic violence, including the cycle of violence, its patterns and effects, recantation and minimization, drug and alcohol abuse, and typical efforts by family members to stop an abusive relationship.

*Post-Arrest Events*

Following defendant's arrest, S.L. vacillated between reconciliation and permanent estrangement from him. Seeking to help him, she spoke with his trial counsel. Then she changed her mind and spoke with the prosecutor.

9

In an effort to secure defendant's release from custody, S.L. convinced her children to lie. In a counter-effort, S.L.'s mother and sister paid the children to write letters specifying defendant's misconduct.

*Defense*

Defendant presented witnesses to impeach D.L. and S.P. He also presented testimony regarding the circumstances surrounding his arrest and evidence demonstrating that he made no efforts to intimidate witnesses while he was at the police station. S.L. testified on defendant's behalf.

Defendant did not testify.

DISCUSSION

We consider the parties' contentions in the order they arose at trial.

I

*Admission of Uncharged Act Evidence*

Defendant contends the trial court abused its discretion when it admitted a prior uncharged act of violence involving defendant's mother, C.N., along with photographs of her injury. The People contend the uncharged act was properly admitted pursuant to Evidence Code section 1109. No abuse of discretion appears.

*Background*

During the argument on motions in limine, defense counsel sought to exclude evidence related to the 2008 prior incident in which defendant struck C.N. and bruised her chin. Defense counsel argued that admission of the evidence would be inflammatory because the photograph of the injury was "truly gruesome." He argued the prejudice outweighed the probative value because the incident did not arise out of any of the charged acts. He argued the "jury is going to listen to this. They're going to hear the testimony, and they're going to stop listening to the evidence. They're going to look at my client and say he hit his mother; he absolutely must have done the rest of this."

10

Defense counsel also argued that presentation of the evidence would consume an undue amount of time.

The prosecutor countered that the evidence was admissible under Evidence Code section 1109, and that the photograph corroborated C.N.'s statements to law enforcement. He sought to admit "maybe three," and "[p]robably between five and eight," photographs to show the bruise from different angles. The prosecutor indicated that the evidence would not take that long to present and was very important to the case.

The trial court indicated it would allow "one [photograph], possibly two, but not more than that." It expressed concern that presenting more photographs would take a lot of time. The trial court was also concerned with the "inflaming nature" of the evidence. It ultimately concluded that the evidence was appropriate, "with limitations on the photos." During later discussion of in limine motions, the trial court excluded a separate uncharged act of domestic violence in order to limit the extent of evidence admitted pursuant to Evidence Code section 1109.

*Analysis*

Evidence Code section 1109, subdivision (a)(1) provides in relevant part: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."

" ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' [Citation.] Section 1109 was intended to make admissible a prior incident 'similar in character to the charged domestic violence crime, and which was committed against the victim of the charged crime or another similarly situated person.' [Citation.] Thus, the statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation. [Citation.] Indeed, proponents of the bill that became

11

section 1109 argued for admissibility of such evidence because of the 'typically repetitive nature' of domestic violence. [Citation.] This pattern suggests a psychological dynamic not necessarily involved in other types of crimes. [Citation.]" (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531-532; fns. omitted.)

"By its incorporation of [Evidence Code] section 352, [Evidence Code] section 1109, subdivision (a)(1) makes evidence of past domestic violence inadmissible only if the court determines that its probative value is 'substantially outweighed' by its prejudicial impact. We review a challenge to a trial court's decision to admit such evidence for abuse of discretion. [Citation.]" (*People v. Johnson, supra*, 185 Cal.App.4th at p. 531, fn. omitted.)

" 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 320, quoting *People v. Yu* (1983) 143 Cal.App.3d 358, 377.)

"Relevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts, and whether the defendant had already been convicted and punished for the prior offense(s). [Citations.]" (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)

In this case, admission of the prior incident involving C.N. was not an abuse of discretion. First, as the parties recognize, the 2008 prior incident was not remote in time to the charged offenses that occurred between 2007 and 2009.

Second, the prior incident against C.N. was no more inflammatory than the charged conduct against S.L. and S.P. A jury would not scorn defendant more for having punched his mother than it would for burning his stepdaughter with hot soup (count 4), strangling his wife and slashing her with a knife (counts 1, 2, and 3), punching his

12

stepdaughter in the stomach (count 5), or leaving his wife black and blue (count 7). Against this backdrop of burning, punching, slashing, and strangling, the punching and bruising of C.N.'s jaw did not tend " 'uniquely' " to evoke an emotional bias against defendant as an individual. (*People v. Bolin, supra,* 18 Cal.4th at p. 320.) Alternatively, admission of the C.N. evidence was harmless by any standard because the S.L. and S.P. evidence cast defendant in the same unfavorable light. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)

Defendant disagrees, claiming an act against one's mother *is* unique because "[m]others are sainted, revered, and celebrated," and are "viewed as sacrosanct." But the Legislature has specified that the term "domestic violence," as used in Evidence Code section 1109, includes "abuse perpetrated against" any "person related by consanguinity or affinity within the second degree," which includes a perpetrator's mother. (Fam. Code, § 6211, subd. (f); see also Evid. Code, § 1109, subd. (d)(3).) Defendant argues that mothers are "sacrosanct," and that violence against them is too inflammatory to be introduced pursuant to section 1109. While we agree with defendant's view of the sacrosanctity of one's mother, the Legislature made no blanket exception to the provisions of section 1109 where the victim is the defendant's mother and we may not do so here.

Third, the act of domestic violence against defendant's mother was not likely to be confused with the present charges, which involved his wife and stepdaughter.

Fourth, contrary to defendant's argument, the prior act had a significant effect on the issues in the case. The evidence was susceptible to an inference, later argued by defense counsel, that the charged incidents had been invented by S.L.'s family. Martinez lied because she was upset with S.L. for sleeping with her husband; S.L.'s mother paid the children to write letters accusing defendant of bad conduct; and S.L. lied to get her children back.

The incident involving defendant's mother was the one prior act of family violence that could not have been concocted by S.L. or her family. The prosecutor acknowledged that, unlike other items of evidence, "this particular bit of evidence is so important to" his case. Defendant responds that the prosecutor had not sought to use the evidence to address the foregoing theory. The point is not supported by record reference or citation of relevant authority and requires no further discussion. (Cal. Rules of Court, rule 8.204(a)(1)(C); *People v. Scott* (1998) 64 Cal.App.4th 550, 564.)

It is undisputed that the C.N. incident's prejudicial effect was heightened by the circumstance that it did not result in a criminal conviction. (*People v. Rucker, supra,* 126 Cal.App.4th at p. 1119; *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) But as we have explained, C.N.'s testimony was no more inflammatory than the charged offenses. It is unlikely the jury disbelieved the prosecution evidence of the present offenses but nevertheless convicted defendant on the strength of the C.N. evidence. (*Ewoldt,* at p. 405.) Moreover, the jury was instructed how to use the uncharged acts of domestic violence. They were told not to consider the evidence for any other purpose. Presumably, the jury followed the trial court's instructions. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)

Having rejected defendant's claim that the evidence was "unduly prejudicial," we also reject his argument that its admission "constituted blatant trampling on [his] due process right to any defense." (Citing, e.g., *Crane v. Kentucky* (1986) 476 U.S. 683, 690 [90 L.Ed.2d 636, 645].) Defendant has not shown that the trial court abused its discretion.

## II

### *Instructional Error*

Defendant contends his convictions of forcible dissuading of a witness under section 136.1, subdivision (c)(1) (counts 12 & 13), must be modified to convictions under subdivisions (a) or (b) of that statute, because the jury, which was instructed with

CALCRIM No. 2622 on the elements of section 136.1, subdivisions (a) and (b), was not further instructed with CALCRIM No. 2623 on the subdivision (c)(1) elements of force or threat of force. The People concede the instructional error but claim omission of CALCRIM No. 2623 was harmless beyond a reasonable doubt. The People have the better argument.

Section 136.1, subdivisions (a) and (b) prohibit dissuading or attempting to dissuade a witness or victim from testifying or reporting a crime. These offenses are punishable as either misdemeanors or felonies.

Section 136.1, subdivision (c) makes the offense a felony if the perpetrator tried to dissuade by using force or a threat of force. (*People v. Lopez* (2012) 208 Cal.App.4th 1049, 1064.) "Whether a defendant used an express or implied threat of force when attempting to dissuade a witness from testifying is a question of fact that subjects the defendant to a greater sentence. Accordingly, *Apprendi* and its progeny require the jury find this fact true beyond a reasonable doubt." (*Ibid.*, citing *Cunningham v. California* (2007) 549 U.S. 270, 274–275 [166 L. Ed. 2d 856, 864-865]; *Blakely v. Washington* (2004) 542 U.S. 296, 303–304 [159 L. Ed. 2d 403, 413-414]; *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [147 L. Ed. 2d 435, 455].)

The People concede that the trial court's instructions asked the jury to determine a violation of subdivision (a) or (b) of section 136.1, not a violation of subdivision (c)(1). The jury was not informed that it was required to find that defendant used an express or implied threat or force, and the jury made no specific finding that defendant used an express or implied threat of force. Absent proper instruction and absent any waiver of trial by jury, there was no finding of a violation of section 136.1, subdivision (c).

The People contend the error is harmless beyond a reasonable doubt because "no rational jury could have found the missing element unproven." (*People v. Ortiz* (2002) 101 Cal.App.4th 410, 416; see *Neder v. United States* (1999) 527 U.S. 1, 19 [144 L. Ed.

2d 35, 53]; *People v. Flood* (1998) 18 Cal.4th 470, 506; *Chapman v. California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711.)  For the reasons that follow, we agree.

*Count 12*

The People note that defendant's January 6, 2009, threat, "I'm going to kill you if I get locked up and you have something to do with it," formed the basis of the count 11 criminal threat as well as the count 12 forcible dissuasion of a witness.  The trial court found pursuant to section 654 that the count 11 criminal threat was not separate from the count 12 dissuasion.  Having found beyond a reasonable doubt that defendant made the statement and specifically intended it to be taken as a threat (count 11), no rational jury could have found the missing element unproven.  (*People v. Ortiz, supra,* 101 Cal.App.4th at p. 416.)

Defendant counters that S.L. testified inconsistently about whether his statements implied the application of force or violence and how the statements affected her.  Thus, at one point S.L. claimed, "He say it all the time, but I know he just say it out of mad, so I wasn't really afraid at all.  I wasn't afraid at all, because he just say it out of anger.  That's how I feel.  That's why I stay with him.  He's just mad, and he say that."  Later, when discussing the December 24, 2008, incident, S.L. claimed she "was scared" and afraid "he was going to kill" her.  But she admitted that, in her discussion of the December 24, 2008, incident with an investigator, she had "told some--some truth, some exaggerated a little bit, [due to] family pressure."  Finally, when discussing the January 6, 2009, incident, S.L. said she was "scared, crying, everything," and she "was crying throughout the night, really scared."

Defendant's reliance on S.L.'s testimony is misplaced.  As to count 12, the jury was instructed that "[i]t is not a defense that no one was actually physically injured or otherwise intimidated."  (See § 136.1, subd. (d).)  Whatever S.L.'s testimony regarding her state of fear relating to the other counts may have been, as to the January 6 incident there was no inconsistency in her testimony regarding her fear of defendant on that

16

occasion. Thus, there was no basis for the jury to return inconsistent verdicts on counts 11 and 12 which arose from the same physical act on the same date.

*Count 13*

The People claim the instructional error is harmless beyond a reasonable doubt with respect to count 13 because S.P. testified that defendant "said that if he was going to go to jail that he's going to make sure that something is going to happen to" the family members. In the People's view, because the prosecutor did not present any additional evidence, no rational juror could have found that defendant had uttered the statement "yet have viewed the statements . . . as not threatening force." (*People v. Ortiz, supra*, 101 Cal.App.4th at p. 416.)

Defendant counters that the jury need not have found that he used force or threatened to use force, because the police records clerk who was present behind a glass partition was not certain whether she had seen defendant mumble something. But the clerk's testimony offers no rational basis for the jury to conclude, first, that defendant dissuaded S.P., and second, that he did not do so by threatening to use force.

Defendant also claims at least one rational juror could have believed that he was merely "mouthing off" to other arrestees at the police station rather than "truly expressly or impliedly threatening the use of force." But the guilty verdict implies that defendant did more than mouth off, and that he truly intended to dissuade S.P. The police department setting did not allow the jurors to do more than speculate whether, although defendant truly intended to dissuade by uttering words implying the use of force, he did *not* truly intend to threaten to *use* force.

Defendant lastly claims the jurors "easily might have believed that the statement underlying the charge was made, but any express or implied threat of force or violence was empty due to the location where the threat occurred and the contrary evidence." To the extent the threat's *emptiness* refers to defendant's lack of intent to threaten force, we have already rejected the argument. To the extent the *emptiness* refers instead to

17

defendant's inability to carry out the threat in police custody, the emptiness is irrelevant because "[i]t is not a defense that no one was . . . intimidated."  (See § 136.1, subd. (d).) The instructional error was harmless beyond a reasonable doubt.

## III

### *Consecutive Sentences*

The parties agree that the matter must be remanded for resentencing.  In the People's view, the three strikes law required the trial court to impose consecutive sentences on counts 4, 7, 8, and 12.  In defendant's view, the concurrent terms are lawful under the three strikes law but the trial court must elucidate its sentence (i.e., strike some strikes) consistent with the dictates of section 1385, subdivision (a).  We remand for resentencing.

### *Background*

Defendant filed a *Romero* (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497) motion requesting the trial court to strike one or both prior strike convictions because (1) postverdict psychological evaluations revealed he suffered from paranoid schizophrenia and polysubstance dependence, and (2) a doubled prison sentence, or a sentence of 25 years to life, would violate the state and federal proscriptions of cruel and/or unusual punishment.  The motion did not address the issue of consecutive sentences or suggest that defendant fell outside the spirit of the three strikes law with respect to subordinate counts within the meaning of *People v. Garcia* (1999) 20 Cal.4th 490 (*Garcia*).  Following argument, the court denied the *Romero* motion ostensibly without comment.

But the trial court stated that it planned to sentence defendant to a single term of 25 years to life plus enhancements, with the sentences on the remaining counts to run concurrently.  The prosecutor objected on the ground, among others, that the offenses were committed on separate occasions against separate victims.  The trial court replied that a single term of 25 years to life was appropriate and that the indeterminate term

18

recommended by probation (150 years to life) is "a pretty big number" that seemed like life without parole. However, the trial court did not expressly decide that consecutive terms would constitute cruel and unusual punishment. Thereafter, the trial court sentenced defendant to concurrent terms of 25 years to life plus enhancements as noted above.

The prosecutor urged that consecutive sentences were required if the offenses were not committed on the same occasion. (Citing § 1170.12, subd. (a)(6) & (7), *People v. Felix* (2000) 22 Cal.4th 651 & *People v. Hendrix* (1997) 16 Cal.4th 508.) The trial court responded, "Understood," and continued with the sentencing. Later, after the trial court stated that sentences on counts one and two should be stayed pursuant to section 654, the prosecutor reiterated that the foregoing authorities required consecutive sentences on the remaining counts. The prosecutor conceded that the sentences on counts 8 and 9 could run concurrently because they were committed on the same occasion. The court responded that the sentences on counts 9 and 11 (criminal threats) were subject to section 654.

*Analysis*

The People contend the trial court erred when it denied the prosecutor's repeated requests to impose consecutive sentences on counts 4, 7, 8, and 12 pursuant to section 667, subdivision (c)(6) and (7).

Section 667 provides in relevant part:

"(c) Notwithstanding any other law, if a defendant has been convicted of a felony and it has been pled and proved that the defendant has one or more serious and/or violent prior felony convictions as defined in subdivision (d), the court shall adhere to each of the following: [¶] . . . [¶]

"(6) If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count pursuant to subdivision (e).

19

"(7) If there is a current conviction for more than one serious or violent felony as described in paragraph (6), the court shall impose the sentence for each conviction consecutive to the sentence for any other conviction for which the defendant may be consecutively sentenced in the manner prescribed by law."

The People rely on *People v. Lawrence* (2000) 24 Cal.4th 219 (*Lawrence*), which explained: "If there are two or more current felony convictions 'not committed on the same occasion,' i.e., not committed within close temporal and [spatial] proximity of one another, *and* 'not arising from the same set of operative facts,' i.e., not sharing common acts or criminal conduct that serves to establish the elements of the current felony offenses of which defendant stands convicted, then 'the court shall sentence the defendant consecutively on each count' pursuant to subdivision (c)(6). Conversely, where a sentencing court determines that two or more current felony convictions were either 'committed on the same occasion' or 'aris[e] from the same set of operative facts' as we have construed those terms in *Deloza* and the instant case, consecutive sentencing is not required under the three strikes law, but is permissible in the trial court's sound discretion." (*Id.* at p. 233; see also *id*. at p. 223; *People v. Deloza* (1998) 18 Cal.4th 585, 595, 599.) In the People's view, counts 4, 7, 8, and 12 occurred on occasions separate from count 3 and from each other; and none of the five counts arose from the same set of operative facts, i.e., none of the elements were established by common acts or common criminal conduct. (*Lawrence, supra,* 24 Cal.4th at p. 223.)

Defendant counters that the trial court could have selected concurrent sentences for three reasons: (1) the offenses constituted a continuing course of conduct that could be said to have occurred on the same occasion (*Lawrence, supra,* 24 Cal.4th at pp. 231-232); (2) each of the disputed counts could have consisted of multiple acts and the court could not determine those acts with sufficient particularity to conclude the acts were separate (*People v. Coelho* (2001) 89 Cal.App.4th 861, 865); or (3) defendant fell outside

20

the spirit of the three strikes law as to the disputed subordinate counts (*Garcia, supra,* 20 Cal.4th at p. 502).

Defendant's first reason fails because the pleadings and the evidence did not suggest, his trial counsel did not argue, and the trial court did not find or hint, that the current felony convictions were committed on the same occasion or arose from the same set of operative facts. The occasions were manifestly separate: count 3 occurred in November 2007; count 4 in summer 2008; count 7 on December 18, 2008; count 8 on December 24, 2008; and count 12 in January 2009. So, too, were the operative facts; no common act or common criminal conduct formed an element of more than one offense. (*Lawrence, supra,* 24 Cal.4th at p. 223.) Defendant's apparent claim that the offenses, although separate under the *Lawrence* analysis, nevertheless occurred on the same occasion because they arose from the same "continuing course of conduct," i.e., continuing family dysfunction, is not supported by authority and has no merit.

Defendant's second reason fails because the case was presented on the basis of distinct unlawful acts and the trial court never indicated that it had trouble distinguishing between acts. Even if the trial court could not determine the conduct underlying the jury's verdict with certitude, there was no suggestion that multiple counts occurred on the same occasion or that the same act or criminal conduct constituted an element of more than one offense.

The People claim defendant's third reason fails because the trial court did *not* find that he fell outside the spirit of the three strikes law as to any of the counts. (*Garcia, supra,* 20 Cal.4th at p. 502.) In denying the *Romero* motion without comment, the trial court manifestly made no such finding.

But in stating that it planned to sentence defendant to a single term of 25 years to life plus enhancements, with the sentences on the remaining counts to run concurrently, the trial court effectively struck the strike allegations set forth in counts 4, 7, 8, and 12 for purposes of sentencing without conducting the analysis, on the record and in an

21

accompanying minute order, that section 1385, subdivision (a) requires. (*People v. Bonnetta* (2009) 46 Cal.4th 143, 145-146, 153 [ordering remand where the trial court had discretion under section 1385 and record showed it intended to exercise such power].)

On remand, the trial court shall consider in its discretion whether to strike any portion of the sentence pursuant to section 1385 and *Garcia, supra,* 20 Cal.4th 490. The trial court shall set forth a statement of its reasons for striking any strike allegations in the minutes of the court as required by section 1385, subdivision (a). Any strike allegation not so stricken shall be sentenced consistent with the views we have expressed.

IV

*Imposition of Sentence on Stayed Counts*

The People contend the trial court erred when it failed to impose sentence on counts 1, 2, 9, and 11 before staying execution of sentence pursuant to section 654. Defendant concedes the error. We accept defendant's concession. (*People v. Duff* (2010) 50 Cal.4th 787, 795-796; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1468-1469.) On remand, the trial court shall impose and stay execution of sentence on counts 1, 2, 9, and 11.

V

*Oral Pronouncement of Fines and Fees*

The People contend the trial court erred when it failed to impose mandatory fines and fees during its oral pronouncement of judgment. Specifically, the court should have imposed a $360 court facilities funding assessment (Gov. Code, § 70373, subd. (a)(1)), a $360 court security fee (Pen. Code, § 1465.8, subd. (a)(1) [now court facilities fee; $40 per count]), and a parole revocation fine in the same amount as the restitution fine (Pen. Code, §§ 1202.4, subd. (b), 1202.45).

Defendant concedes the error as to the first two fines. Because the matter must be remanded for resentencing, we will direct the trial court to include both fines in its oral pronouncement of judgment.

22

Defendant further requests that the restitution fine and parole revocation fine be imposed in the minimum amount of $200 based upon his inability to pay. The trial court will have an opportunity to address defendant's request in the first instance.

## VI

### *Withdrawn Contention*

In his opening brief, defendant contended the trial court erred when it imposed a consecutive one-year punishment for the prior prison term where the term was for the same offense punished as a serious felony enhancement. In his reply brief, defendant withdrew the argument.

## VII

### *Correction of Abstract of Judgment*

Our review of the abstract of judgment does not disclose any disposition of case No. 07-1997, in which the court ordered execution of a previously suspended prison sentence of six years four months. The amended abstract prepared by the court upon resentencing shall include the disposition of that case.

## VIII

### *Section 667, subdivision (e)(2)(C)*

Finally, we asked the parties to submit letter briefs addressing the impact, if any, of section 667, subdivision (e)(2)(C) (Proposition 36 at the November 2012 General Election) upon the sentencing in this case. We have since concluded that prisoners, such as defendant, who were serving three strikes sentences when Proposition 36 was enacted, must raise the issue by petition in the trial court. (*People v. Yearwood* (2013) 213 Cal.App.4th 161.)

### DISPOSITION

The judgment of conviction is affirmed. Defendant's sentence is vacated and the matter is remanded to the trial court for resentencing consistent with this opinion. The

amended abstract of judgment issued upon resentencing shall include the disposition of case No. 07-1997.


       HULL        , Acting P. J.


We concur:


      ROBIE       , J.


      MURRAY     , J.