[Nos. F063835, F064116. Fifth Dist. Oct. 7, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
ADAM DANIEL ANAYA et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, this opinion is certified for publication with the exception of parts I., II., III.E. and F., IV., and V.

Counsel

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant Adam Daniel Anaya.

Robert L. S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant Eric Thomas Wolfe.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Leanne LeMon, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

PEÑA, J.—

## INTRODUCTION

Defendants Adam Daniel Anaya and Eric Thomas Wolfe were tried together in the Superior Court of Tulare County on various criminal charges stemming from their forceful attempts to collect a criminal street gang debt. After their convictions, defendants were sentenced separately and appealed separately. Following consolidation of their appeals, defendants contend (1) the convictions must be reversed because (a) the jury was provided conflicting instructions on the manner to assess the key witness's credibility, and (b) juror misconduct; (2) there is insufficient evidence to support (a) the extortion convictions, (b) the dissuading a witness convictions, and (c) the one battery conviction; (3) the life terms imposed for the extortion and the dissuading a witness convictions are not authorized; (4) as defendants have been improperly convicted of both robbery and receiving stolen property, the convictions for receiving stolen property must be reversed; (5) this case must be remanded for the trial court to impose or strike the gang enhancements to the term for the burglary convictions and the receiving stolen property convictions; and (6) multiple enhancements for one prior serious felony conviction are not authorized, and only one stayed prior prison term should appear on the abstracts of judgment. As outlined below, we agree with defendants' contentions (3), (4), (5), and (6). Accordingly, the judgments are reversed in part and affirmed in part.

## PROCEDURAL BACKGROUND

In a first amended information, both defendants were alleged to have committed the crimes of extortion (Pen. Code,[1] § 520; count 1), burglary (§ 459; count 2), home invasion robbery (§ 211; count 3), assault by means likely to produce great bodily injury (§ 245, subd. (a)(1); count 4), dissuading a witness or victim (§ 136.1, subd. (b)(2); count 5), participation in a criminal street gang (§ 186.22, subd. (a); count 6), and receiving stolen property (§ 496, subd. (a); count 7). An additional count of dissuading a witness or victim (§ 136.1, subd. (b)(2); count 8) was alleged as to defendant Wolfe. Excepting count 6, it was further alleged that the crimes were committed for the benefit of a street gang (§ 186.22, subd. (b)(1)(A), (C), (4)). As to all counts, it was also alleged that each defendant had a prior strike conviction and a prior serious felony conviction (§§ 667, subds. (a)(1), (b)–(i), 1170.12, subds. (a)–(d)). Except for count 8, it was also alleged that defendant Anaya had suffered a prior prison term under section 667.5, subdivision (b). And it was further alleged with regard to the home invasion robbery that the crime was committed in concert with others (§ 213, subd. (a)(1)(A)).

During trial, the dissuading a witness or victim offenses (counts 5 & 8) were amended to allege violations of subdivision (b)(1) of section 136.1, and the assault likely to produce great bodily injury offense (count 4) was reduced to a battery (§ 242).

Following an eight-day trial, defendants were convicted on all counts. In bifurcated proceedings, defendant Anaya admitted the prior conviction allegations and the trial court found the prior strike and serious felony allegations against defendant Wolfe to be true.

On October 21, 2011, defendant Anaya was sentenced to a total of 30 years to life on count 3, plus five years for the prior serious felony conviction. Additional terms were imposed on the remaining counts, to be served either concurrently or stayed pursuant to section 654.

On November 7, 2011,[2] defendant Anaya filed a timely notice of appeal.

On December 13, 2011, defendant Wolfe was also sentenced to a total of 30 years to life on count 3, plus five years for the prior serious felony conviction. The sentences imposed on the remaining counts and special allegations were imposed concurrently or were stayed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] A second notice of appeal was filed November 16, 2011, by defendant Anaya pro se.

On December 22, 2011, defendant Wolfe filed a timely notice of appeal.[3]

## FACTS

*Facts Specific to the January 2010 Incident*

Eric Dahlberg lived across the street from his friend Roy Gomez in Tulare. On January 31, 2010, Dahlberg called 911 after he became concerned about a number of people he observed at Gomez's home. He had never seen these six or so men at his neighbor's home before. Gomez and the others were standing near the driveway and appeared to be talking. But then Gomez started backing up and the others were getting closer, "kind of circling around him." Dahlberg thought it was a "little suspicious." Gomez had backed up to the garage door and put his hands up. Shortly thereafter, Gomez's cousin came out from inside the house.

Although Dahlberg could not hear what was being said, he could see clearly. He focused on one person who appeared older and "darker." That individual stood out and seemed like he was telling the others what to do. He made lots of hand gestures: when he pointed to the curb, two individuals went to the curb; when he pointed to the house, everyone else went inside.[4] That individual also used his cell phone a couple of times. The individual "was in Roy's face," while the others were behind him. Dahlberg did not witness any physical altercation.

By the time the police arrived in response to his call, Dahlberg was at the back of his house. Because he could not clearly see individual faces, he could not identify anyone other than Gomez and his cousin. Later, Gomez came to Dahlberg's door. He was "breathing hard" and was "acting shocked."

Another neighbor, Richard Hernandez, was outside working on his truck that same day. He recalled seeing "a bunch of guys" pull up in a couple of cars. He figured they were friends of Gomez's. It was not unusual until he noticed the group had Gomez backed up against the garage door. There were six or seven men, most of whom were young. Two were older and one stood out because he was the only one talking and everyone else surrounded him. Hernandez could not decide if that man was African-American or a dark-complexioned Hispanic. That man was loud, "running his mouth," yelling and screaming.

---

[3] On February 14, 2013, this court granted Wolfe's motion to consolidate the appeals. Further, defendants were deemed to have joined in one another's arguments to the extent the arguments were beneficial to each of them.

[4] Two individuals stayed at the curb when the others went inside. They looked up and down the street.

Hernandez became concerned because Gomez was standing against the garage and everyone was "surrounding him." They no longer looked like friends. Although he did not talk to Gomez's cousin much, he knew who he was and he recognized him when he came outside. The group's focus then shifted to Gomez's cousin and they all went inside. About 10 minutes later, the police arrived.

When Hernandez gave his statement to police, his memory was fresh; he told the truth. He told Detective Jesus Guzman that the darker man had told Gomez's cousin, "This doesn't concern you. Get out of here." He recalled seeing the darker man on his cell phone; he wore a red hat. Gomez's cousin told the darker man that he did not have much money, but that he could take what he had. Hernandez recalled telling the detective that he saw "a larger white guy try to strike" Gomez.

In January 2010, Norteño gang member A.T. was living with his aunt, uncle, and cousin Roy Gomez in Tulare. In response to a midmorning knock, A.T. answered the door to find a man he believed to be John Delgado[5] asking to speak with his cousin. He knew who Delgado was because Delgado had visited Gomez in the past. A.T. noted there were other people waiting outside near a white truck and a white car, but he did not recognize the others. Gomez stepped outside with Delgado.

A.T. resumed speaking on the telephone with his girlfriend. Eventually, he heard people talking loudly or shouting. He hung up the telephone, assuming there was an argument, and went outside.

Once outside, A.T. found his cousin with his back to the garage. About seven people were encircling him. Gomez's hands were out (palms out at shoulder height) in front of him. He seemed scared and confused. Those surrounding Gomez were later identified as Wolfe, Anaya, Steven Delgado, Robert Pompa and others. Wolfe was standing "kind of offset"; A.T. had never met Wolfe but knew who he was.

Realizing the argument was about a debt[6] he himself owed, A.T. asked what was going on. Wolfe told A.T. to mind his own business and continued to confront Gomez over the fact he "owed the homies money." Eventually, A.T. was able to tell Wolfe that it was not Gomez they were looking for, rather it was him. Wolfe made a phone call. He then apologized to Gomez and pointed to A.T., saying, "You are the one."

---

[5] "John" Delgado was actually Steven Delgado.

[6] A.T.'s debt was incurred as a result of borrowing money or drugs from the gang (then selling the drugs for profit). A.T. borrowed from the gang on two occasions, fell behind on payments, and had not repaid that debt plus "tithe" and interest.

Anaya, who had been standing near the sidewalk, said "cops," and pointed down the street. In response to this news, everyone went inside the house. Once inside, A.T. was surrounded by Wolfe, Delgado, Pompa and another individual. Anaya and a second individual stayed at the window as lookouts. Pompa struck him in the face and he was verbally harassed. Wolfe told A.T. he owed money and began grabbing items in the house. A.T. tried to explain that the house belonged to his aunt and that the property in the home was not his. He offered to pay what he owed, and also offered the $200 he had in his possession. In the room A.T. shared with his cousin, Wolfe and Anaya were "taking things apart"; A.T. again explained most of the property belonged to his aunt. Wolfe or Delgado told him to shut up.

About this same time, the police knocked on the door. The officers had everyone exit the back room with their hands up. Identification was checked and names were taken. A.T. gave the officers a false name because he had violated his parole.[7] Ultimately, no one was arrested and the police left. A.T. did not say anything to the police then because he had been told to shut up.

After the police left, Wolfe, who did most of the talking, told A.T. what was going to happen. Wolfe said A.T. owed $5,000, it needed to be paid, and they would be taking items with them. He was reminded that he knew "what happens" to people who do not "pay up." He would be given a phone number for "Pablo." He was to call Pablo in an hour to receive additional information about whom to pay. A.T. told Wolfe he would do his best to pay the debt. Thereafter, A.T.'s belongings were loaded into a white or cream-colored Chevrolet Blazer, including computers, printers, hard drives and keyboards. He did not give anyone permission to take the items.

After Wolfe, Anaya and the others left, A.T. called the telephone number he was given for Pablo. He recognized the voice on the other end as that of Wolfe. A.T. was told to call the number the following day about a meeting. The next day, he called Pablo's number again; Wolfe answered. Wolfe advised A.T. that he would be picked up in 30 minutes; however, a few moments later, Wolfe called back. A.T. was advised they were waiting for him outside.

A.T. went outside and got into the car as requested. Wolfe was driving, Pompa was the front seat passenger, and Delgado was in the back. They went to what A.T. assumed was Pompa's home. Pompa offered him a beer, but he declined. He was nervous and fearful. Wolfe advised him he had 29 days within which to pay back $5,000. Although A.T. had borrowed $3,000, the amount increased significantly because of "fines." A.T. asked that his belongings be returned, but Wolfe denied the request. A.T. also asked if he could

---

[7] In 2006, A.T. was convicted of second degree burglary and receiving stolen property.

have "assistance" in repaying the debt. After making a telephone call, Wolfe denied A.T.'s request for assistance.

Despite having no job[8] or other financial resources, A.T. understood that if he did not repay the debt, he would be "done," as stated by Wolfe. A.T. understood "done" as meaning he would "be whacked" or killed. A.T. was further advised that if he loved his kids, he would pay the money within the timeframe provided. He was then taken home.

Three or four days later, A.T. was arrested for absconding from parole and was taken to jail. Although he did not want to tell police about what had happened, and knew he was risking his life by doing so, A.T. also feared what would happen when the debt repayment deadline expired. He gave a statement to Detective Guzman and received protective custody.[9]

While serving time in jail, A.T. was transported to the Bob Wiley Detention Facility. On a bus returning from court, Wolfe was seated behind him. Wolfe told him "not to do it," and that he could fix everything, including A.T.'s status with the gang. Wolfe offered A.T. a car and some money not to say anything. A.T. did not believe him. On another occasion, as he and Detective Guzman passed Wolfe in a cell, Wolfe said, "Don't do it A[.]"[10] That meant A.T. should not talk to the police.

A.T. is still afraid because he still owes money. By testifying, he is considered to be "telling on" defendants and "the whole rest of the gang."

Tulare Police Officer Jeremy Faiman testified that on January 31, 2010, about 1:10 p.m., he responded in a marked K9 patrol unit to a possible home invasion in progress. As he approached the home, he observed two subjects standing out front, looking up and down the street. After calling for additional units, he contacted those subjects, who were identified as Manuel Rubio and Mario Duarte. As he directed Rubio and Duarte to sit down with their hands in sight, Roy Gomez exited the home, quickly shutting the door behind him. Gomez consented to a look around the house, indicating a couple of "homies" were inside. He was nervous.

---

[8] When in good standing, A.T. sold drugs on behalf of the Norteño gang. He is no longer a Norteño gang member.

[9] Once he was released from custody, A.T. was provided with additional protection in the form of housing, utilities, and food assistance, and was provided a cell phone as well. He received that assistance between February and September 2010, but was ultimately asked to leave the program after breaking a rule.

[10] Jesus Flores, a correctional deputy with the Tulare County Sheriff's Department, testified that on February 5, 2010, he was working at the main jail. He and Detective Guzman were escorting A.T. toward an interview room. As the group passed cell No. 7, Flores heard someone say, "A[.], don't do it, don't do it." Flores looked back and saw Wolfe.

Officer Faiman and an undercover officer approached the unlocked door. They entered and cleared the home. Several people exited a bedroom. Everyone was "really calm. It was almost a scary calm." Wolfe, Anaya, Pompa, Delgado, Jaime Rodriguez, and Adrian Vasquez were identified. Other than a legal folding pocketknife, no weapons were found on anyone located in the home. When asked for identification, A.T. provided a false name. Later, Officer Faiman learned A.T.'s true name and that he was wanted for a parole violation.

While the police were present, no one in the home said anything about a crime being committed. They said "everything was cool, they didn't need any police assistance." Officer Faiman did not notice any computer equipment, but he was not looking for it. His focus was on the people inside. The television was not on, there was no beer in view, nor was there any food being prepared or grilled at the home. Thereafter, the investigation concluded and the officers left the residence.

Roy Gomez testified that he was living with his parents and cousin in January 2010. He recalled the day the police came to the house. A couple of friends had come over to watch football and "hang out." He could not recall everyone's name.[11] Wolfe was there; he and Wolfe would get together now and then to watch football. Gomez could not recall how often Wolfe had been to his home; he had never been to Wolfe's house. Anaya was also there, arriving with Wolfe. Gomez had been introduced to Anaya previously through a friend whose name he did not remember. There were five or six people total.

Everyone arrived at the same time because Gomez recalled hearing the doorbell. He believed he answered the door and went outside to speak with them first. Everyone greeted one another, "nothing really serious." Then, with the exception of a few people who had stayed outside to smoke, the group headed inside. They had only been sitting down and watching television for two to three minutes when the police arrived. Gomez could see through the front window when the police arrived, and he went outside to see what the problem was.

The police advised him they had been sent about "a burglary or something going on." Gomez did not want the police to go inside his home, but he did acknowledge he was on parole and thus subject to search. He told the police there was no reason for them to go inside. He sat outside on the curb while

---

[11] Later, Gomez testified that he knew who Delgado and Pompa were. He thought he knew who Mario Duarte, Manuel Rubio and Jaime Rodriguez were as well. He claimed hearing the names of the others present that day "refreshed [his] mind."

the house was searched. After the police left, the group stayed at the house "for a little bit, watched TV and stuff, you know, and then everybody took off."

His cousin A.T. had a lot of computers. A.T. tried to sell everything he had that day, and did sell a computer to Wolfe after the police left. A.T. carried the computer he sold to Wolfe out to Wolfe's white Blazer.

Gomez stated there had not been any dispute or argument that day, nor did any physical violence occur. He did not know if he talked to Detective Guzman after his cousin's arrest. At the police station, Gomez "pled the right to remain silent," so he did not give a statement.[12] He denied telling the detective there had been a little misunderstanding and it had been straightened out and was not gang related. He did not tell Guzman he was struck or hit, nor did he tell Guzman that he did not know Wolfe. Neither did he recall telling Guzman anything about computers.

Although he used to be a gang member, Gomez was no longer a gang member because he "grew out of it." And he just "hung out" with the West Side Tulare Norteños. Gomez has three felony convictions, the last in 2005.

Jaime Rodriguez testified for the defense. In January 2010, he recalled walking on the street in Tulare on his way to see his friend Isabel. He saw two friends standing outside a house he later learned belonged to Gomez. He stopped to say hello to Manuel Rubio and Mario Duarte. They spoke for a few minutes and then Gomez invited them inside to watch the polo game and to barbeque. There were no arguments, fights, or disagreements. They watched the polo game for a few minutes before the police arrived. They had gone into a back room to smoke the marijuana Rodriguez had with him. They also looked at some computers; A.T. offered to sell the computers. The police arrived, but after checking everyone's identification, they left. Rodriguez then left because he was nervous. He was on probation and did not want to go back into custody.[13]

On February 4, 2010, Tulare police officers conducted a probation compliance check at a residence in Tulare. The officers were going to attempt to take Wolfe into custody. No one responded to the front door. Helicopter surveillance, however, noted someone leaving through the back. After a vehicle pulled out of the garage, a traffic enforcement stop was conducted on a white

---

[12] Detective Guzman interviewed Gomez on February 4, 2010, at the Tulare Police Department. The videotaped interview was played for the jury.

[13] On cross-examination, Rodriguez qualified the group was only discussing a barbeque. Detective Guzman testified he took Rodriguez's statement, and Rodriguez had told him there was a barbeque going on in the backyard. Rodriguez made no mention of marijuana.

Chevrolet Blazer. Wolfe's girlfriend Desiree Villareal was contacted. She reported that Wolfe was at work. A subsequent probation search was conducted and numerous computer parts and equipment were located in the garage.

Detective Guzman with the Tulare County Police Department was assigned to investigate an incident involving A.T. Related thereto, on February 4, 2010, Wolfe and Anaya were taken into custody. Following *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]) warnings, Anaya gave a recorded statement. He indicated he was helping his girlfriend's uncle—Robert Pompa—pick up and load some computer equipment. He recalled carrying out a monitor and keyboard from inside a home. Anaya admitted knowing Delgado. He denied being a gang member himself, but acknowledged associating with Northerners, or Norteños.

On February 5, 2010, Detective Guzman responded to the main jail. He and Deputy Flores were walking with A.T. Passing Wolfe's cell, he heard Wolfe say, "[D]on't do it A[.], don't do it."

During the investigation Detective Guzman listened to more than 10 calls made from the Tulare County Sheriff's Department pretrial facility. He recognized the persons speaking in those phone calls as Wolfe, his girlfriend Desiree Villareal, and Wolfe's stepbrother Dexter Rabadan. Several of the recorded phone calls were played for the jury.[14]

*Facts Relevant to the Gang Allegations*

Patrick O'Donohoe is a peace officer with the City of Tulare. While on duty on November 20, 2006, O'Donohoe came into contact with Anaya. At the time, Anaya was wearing blue jeans, a gray sweatshirt, and white shoes with red shoe laces, a red belt, and a red and black '49ers beanie.

Tony Espinoza is a detective with the Tulare Police Department assigned to the gang unit. On July 16, 2009, the detective came into contact with Mario Duarte and Manuel Rubio. Duarte and Rubio, accompanied by Johnny Hernandez, were sitting on a park bench in Tulare. Duarte was photographed wearing various items of red clothing. There was writing or gang graffiti on the table in red ink, and each of the individuals had a red permanent ink marker in his possession.

---

[14] An investigator aide with the Tulare Police Department downloaded recordings of inmate phone calls made from the Tulare County jail to a particular telephone number provided by Detective Guzman. Phone calls were made on January 16, February 14, February 18 and February 25, 2010. The same telephone number was associated with all four calls.

On January 29, 2010, Detective Espinoza was on duty and conducted a traffic stop of a vehicle; the front license plate was not fully secured. Wolfe was the driver and Steven Delgado was the passenger. In a photo taken during the traffic stop, Wolfe was photographed wearing various items of red clothing. A few days later, on February 4, 2010, Detective Espinoza assisted with the search of a residence. The car he had pulled over a few days earlier containing Wolfe was located at the home.

Detective Guzman was designated a gang expert. He estimated there were over 400 active gang members in Tulare. He described the formation of the Norteño gang and the signs and symbols related to the gang. The gang's activities included assaults, assaults with a deadly weapon, robberies, drug sales, and weapons possession. Guzman also testified to predicate offenses, gang packets, and the gang modules at the Bob Wiley Detention Facility.

In Detective Guzman's opinion, Wolfe is an active "Northerner" gang member and was on January 31, 2010. His opinion is based upon police reports, arrests, contacts, jail housing assignments, and information known to the department.

It is also the detective's opinion that Anaya is an active Northerner gang member and was on January 31, 2010. Guzman's opinion is based on the fact he asked Anaya if he was a gang member and Anaya responded, " 'I guess so.' " His opinion is also based on Anaya's jail housing assignment and the fact that San Francisco '49ers clothing is typically worn as a symbol of the Northern gang.

Detective Guzman was also of the opinion that Delgado, Pompa, Duarte, Rubio and Rodriguez were all active gang members. Further, the detective believed A.T. was a gang member until January 31, 2010. He was no longer a gang member because he failed to pay his debt and because A.T. was considered a "rat" for telling the police about a crime committed by a fellow gang member.

Presented with a hypothetical situation involving similar facts, Detective Guzman believed the type of crimes alleged to have been committed would have been committed at the direction of and for the benefit of the Norteño criminal street gang. Additionally, those crimes would have been committed in association with the Norteño criminal street gang and furthered its objectives.

Defense expert Albert Ochoa, a behavioral interventionist, worked at a charter school in Visalia. He met with students, including those involved in gangs, every day. His past experience as executive director of a community

center and mental health specialist at a youth services agency also put him in contact with young people involved in gangs, either as members or as associates. Ochoa has a certificate in basic counseling and psychology from La Puente Bible College. He is regularly contacted regarding his opinion on gang issues and has been previously certified as a gang expert in Tulare County.

Following his interviews with Wolfe and Anaya, and his review of the materials provided by Wolfe's attorney, Ochoa concluded that Wolfe and Anaya associate with the gang. In his opinion, they are not active gang members.

On cross-examination, Ochoa indicated that a photograph of Anaya wearing items of red clothing, taken during a 2006 contact with law enforcement, would not change his opinion that Anaya was not a gang member because the photo was six years old. Ochoa indicated he had not listened to the phone call between Wolfe and his half brother so that fact was not considered for purposes of his opinion. Ochoa acknowledged that he is paid to testify. He further acknowledged that were he to have found Wolfe and Anaya to be active gang members, he would not have been paid. Ochoa could not opine as to whether Delgado, Pompa and the others were gang members because he did not interview them. Ochoa agreed that an associate of the gang does not "call shots." He further agreed that if someone "pleads to a crime" and admits a related gang enhancement, he would opine that individual is an active gang member.

## DISCUSSION

I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III. *Sentencing Issues*

Defendants contend the court committed *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*) error when it sentenced them to life terms on counts 1 and 5 pursuant to section 186.22, subdivision (b)(4)(C).

### A. *Relevant Authorities*

The Sixth and Fourteenth Amendments to the United States Constitution preclude a trial court from imposing a sentence above the

---

*See footnote, *ante*, page 252.

statutory maximum based on a fact, other than a prior conviction, not found to be true by a jury. (*Cunningham v. California* (2007) 549 U.S. 270, 274–275 [166 L.Ed.2d 856, 127 S.Ct. 856]; *Blakely v. Washington* (2004) 542 U.S. 296, 303–304 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *Apprendi, supra*, 530 U.S. at p. 490.)

In a recent decision, issued after briefing had been completed in this matter, the United States Supreme Court determined that facts that increase a mandatory minimum sentence must be submitted to the jury. (*Alleyne v. United States* (2013) 570 U.S. ___ [186 L.Ed.2d 314, 133 S.Ct. 2151] (*Alleyne*).) In so holding, the court overruled its earlier contrary decision in *Harris v. United States* (2002) 536 U.S. 545 [153 L.Ed.2d 524, 122 S.Ct. 2406].[17]

In *Alleyne*, the jury convicted the defendant of robbery affecting interstate commerce (18 U.S.C. § 1951(a)) and using or carrying a firearm in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A)). Using or carrying a firearm subjects an offender to a term not less than five years, brandishing the firearm subjects an offender to a term not less than seven years, and discharging the firearm subjects an offender to a term not less than 10 years (18 U.S.C. § 924(c)(1)(A)(i)–(iii)). More specifically, the jury's verdict indicated the defendant had used or carried a firearm during the commission of the offense. (*Alleyne, supra*, 570 U.S. at pp. ___–___ [133 S.Ct. at pp. 2155–2156].)

The presentence report recommended a seven-year sentence, which reflected the mandatory minimum sentence relative to an offender who had brandished a firearm during commission of the offense. Alleyne objected to the recommended seven-year term, contending it would violate his Sixth Amendment right to a jury trial as the jury did not find brandishing beyond a reasonable doubt. The district court, however, relied upon *Harris v. United States* in overruling Alleyne's objections, explaining that brandishing was a sentencing factor it could properly find by a preponderance of the evidence. Thus, it imposed the seven-year term. The court of appeals affirmed. (*Alleyne, supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2156].) In reversing, the Supreme Court stated: "In *Apprendi*, we held that a fact is by definition an element of the offense and must be submitted to the jury if it increases the punishment above what is otherwise legally prescribed. [Citation.] While *Harris* declined to extend this principle to facts increasing mandatory minimum sentences, *Apprendi*'s definition of 'elements' necessarily includes not only facts that increase the ceiling, but also those that increase the floor. Both kinds of facts alter the prescribed range of sentences to which a defendant is exposed and

---

[17] A decision of the United States Supreme Court that results in a new rule will apply to all criminal cases still pending on direct review. (*Griffith v. Kentucky* (1987) 479 U.S. 314, 328 [93 L.Ed.2d 649, 107 S.Ct. 708].)

do so in a manner that aggravates the punishment. [Citations.] Facts that increase the mandatory minimum sentence are therefore elements and must be submitted to the jury and found beyond a reasonable doubt." (*Alleyne, supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2158].) The *Alleyne* court held that "[d]efining facts that increase a mandatory statutory minimum to be part of the substantive offense enables the defendant to predict the legally applicable penalty from the face of the indictment." (*Alleyne, supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2161].)

Subdivision (b) of section 186.22 concerns increased terms of imprisonment when the jury finds that a crime is committed for the benefit of a criminal street gang. When applicable, subdivision (b)(1) imposes an additional term of imprisonment when a defendant is convicted of a felony and the jury determines the crime was committed for the benefit of a criminal street gang. It begins by stating, "Except as provided in paragraphs (4) and (5), any person who is convicted of a felony" committed for the benefit of a criminal street gang shall receive the following sentence enhancements: (1) an additional term of two, three, or four years if only the enhancement is found true (§ 186.22, subd. (b)(1)(A)), (2) an additional term of five years if the felony is a serious felony as defined in section 1192.7, subdivision (c) (§ 186.22, subd. (b)(1)(B)), or (3) an additional term of 10 years if the felony is a violent felony as described in section 667.5, subdivision (c) (§ 186.22, subd. (b)(1)(C)). Subdivision (b)(2) and (3) of that section assists the trial court in determining which term of the sentencing triad should be imposed when the court has discretion to choose the additional term.

On the other hand, subdivision (b)(4) of section 186.22 requires the trial court to impose a term of life in prison instead of the sentence otherwise required by law for the following crimes: home invasion (§ 213), carjacking (§ 215), felony shooting at an inhabited building (§ 246), infliction of great bodily injury while discharging a firearm from a vehicle in the commission of a felony (§ 12022.55), "extortion, as defined in Section 519; or threats to victims and witnesses, as defined in Section 136.1." (§ 186.22, subd. (b)(4)(B), (C).)

When imposing the indeterminate term of life in prison, the trial court must choose a minimum sentence that is the greater of two alternatives. The first alternative is the term that would otherwise be imposed pursuant to section 1170 for the underlying conviction, including any enhancements. (§ 186.22, subd. (b)(4)(A).) The second alternative depends on the crime committed. The minimum term is 15 years if the crime is a home invasion (§ 213), carjacking (§ 215), felony shooting at an inhabited building (§ 246), or if the defendant inflicts great bodily injury while discharging a firearm from a vehicle in the commission of a felony (§ 12022.55). (§ 186.22,

subd. (b)(4)(B).) The minimum term is seven years if the crime is "extortion, as defined in Section 519; or threats to victims and witnesses, as defined in Section 136.1." (§ 186.22, subd. (b)(4)(C).)

■ In sum, when a crime is committed for the benefit of a criminal street gang, subdivision (b) of section 186.22 requires the trial court to impose either (1) a term of imprisonment in addition to the term otherwise imposed by law, or (2) a life term with a minimum term of imprisonment determined as explained in the preceding paragraphs if the crime is specifically identified in subdivision (b)(4).

### B. *Analysis*

Count 5 charged defendants with dissuading a witness in violation of section 136.1, subdivision (b)(1), by unlawfully attempting to prevent and dissuade A.T. from reporting a crime to law enforcement. Count 1 charged defendants with extortion in violation of section 518. It was further alleged as to both counts that defendants committed the offenses "for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members." Additionally, it was alleged the offenses caused "the sentencing to be pursuant to section 186.22(b)(4)."

The verdicts found defendants guilty of "Dissuading a Witness From Reporting a Crime, to wit [A.T.], a violation of . . . Section 518 [*sic*: 136.1, subd. (b)(1)]" as charged in count 5. The jury also found the enhancement true: "We, the Jury, further find to be true the special allegation that said offense was COMMITTED FOR THE BENEFIT OF, AT THE DIRECTION OF, OR IN ASSOCIATION WITH A CRIMINAL STREET GANG . . . ." The jury returned a guilty verdict on count 1 that read:

"We, the Jury, find the Defendant guilty as charged in Count 1 of the First Amended Information, to Extortion by Threat or Force of [A.T.], a violation of . . . section 518 which occurred on or about January 31, 2010.

"We, the Jury, further find to be true the special allegation that said offense was COMMITTED FOR THE BENEFIT OF, AT THE DIRECTION OF, OR IN ASSOCIATION WITH A CRIMINAL STREET GANG, within the meaning of . . . sections 186.22(b)."

The trial court imposed sentences of 14 years to life for the convictions as charged in count 5 and count 1. The base term was seven years to life, which was doubled because each defendant had suffered a prior "strike" conviction within the meaning of section 667, subdivision (e).

In this case, the trial court relied on subdivision (b)(4)(C) of section 186.22 to impose terms of seven years to life. Imposition of this sentence is permissible only if defendants were convicted of "extortion, as defined in Section 519; or threats to victims and witnesses, as defined in Section 136.1." (*Ibid.*)

## C. *The Terms Imposed for Witness Intimidation*

Defendants argue they were convicted only of attempting to dissuade a witness from reporting a crime, rather than attempting to dissuade a witness from reporting a crime with threats. The People assert that because the phrase "threats to victims and witnesses" refers to section 136.1, any conviction pursuant to this section permits imposition of the indeterminate sentence of life with a minimum term of seven years.

Subdivision (b)(1) of section 136.1 provides that anyone who attempts to prevent or dissuade another person who has been the victim of a crime from reporting a crime to law enforcement is guilty of an offense that may be punished as either a misdemeanor or a felony. It also specifically names subdivision (c) as an exception to its provisions.

By comparison, subdivision (c) of section 136.1, in relevant part, provides that every person who commits an act described in subdivision (b) where the act is accompanied by force or by an express or implied threat of force is guilty of a felony punishable by imprisonment for two, three, or four years. Accordingly, a defendant who attempts to dissuade a witness from reporting a crime is guilty of either a misdemeanor or a felony, but, if the defendant's attempt is accompanied by an express or implied threat of force, the defendant is then guilty of a felony with an increased term of imprisonment.

As explained above, defendants were alleged to have violated section 136.1, subdivision (b)(1), attempting to dissuade a victim of a crime from reporting a crime to law enforcement. The amended information did not charge defendants with using an express or implied threat of force. The instructions also did not inform the jury it must find defendants used an express or implied threat of force.[18] Nor did the jury make a specific finding the

---

[18] The jury instruction on count 5 was read to the jury as follows: "The defendants are charged in Count 5 with intimidating a witness in violation of . . . Section 136.1. [¶] . . . [¶] To prove that a defendant is guilty of this crime, the People must prove that: [¶] One, the defendant maliciously tried to encourage [A.T.] from making a report that he or she was the victim of a crime to any peace officer or state or local law enforcement officer. [¶] And, two, [A.T.] was a crime victim. [¶] And, three, the defendant knew he was trying to discourage [A.T.] from causing arrest or causing prosecution, and intended to do so. [¶] A person acts

defendants used an express or implied threat of force. This is the exact factual setting in *People v. Lopez* (2012) 208 Cal.App.4th 1049, 1065 [146 Cal.Rptr.3d 113], where we held: "Section 186.22, subdivision (b)(4)(C) permits imposing a sentence of seven years to life only if the defendant makes 'threats to victims and witnesses, as defined in Section 136.1.' Only subdivision (c)(1) of section 136.1 refers to the use of an implied or express threat. Therefore, the plain meaning of section 186.22, subdivision (b)(4)(C) is that a seven-year-to-life sentence can be imposed only if the jury convicts the defendant of attempting to dissuade a witness by use of an implied or express threat of force pursuant to section 136.1, subdivision (c)(1)."

The People assert that the holding in *People v. Neely* (2004) 124 Cal.App.4th 1258 [22 Cal.Rptr.3d 274] permits the sentence imposed because the reference to section 136.1 in section 186.22, subdivision (b)(4)(C) is not limited to any particular subdivision of that section and should be construed as including all the offenses set forth in section 136.1. We do not agree. In *Neely*, the defendant contended his prior conviction of violating section 136.1, subdivision (a)(2) did not qualify as a serious felony under section 1192.7, subdivision (c)(37). (*People v. Neely, supra*, at p. 1261.) Section 1192.7, subdivision (c)(37) defines "intimidation of victims or witnesses, in violation of Section 136.1" as a serious felony. Noting that none of the specific offenses in section 136.1 mentions "intimidation," *Neely* concluded that the phrase "intimidation of victims or witnesses" in section 1192.7, subdivision (c)(37) constituted a shorthand description of section 136.1 generally. (*People v. Neely, supra*, at p. 1266.) Unlike section 1192.7, subdivision (c)(37), however, section 186.22, subdivision (b)(4)(C) cannot be construed as a shorthand description of section 136.1 in its entirety. The requirement of force or threat in section 136.1 is particularly limited to a violation of subdivision (c) that expressly and unambiguously creates a statutory distinction between offenses that require force or threat and offenses that do not.

Although the intent of section 186.22, subdivision (b)(4) is to increase the punishment for gang-related crimes,[19] we cannot overlook the clear and unambiguous language of both section 186.22, subdivision (b)(4)(C) and section 136.1.

---

maliciously when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice. [¶] As used here, witness means someone . . . who knows about the existence or nonexistence of facts relating to a crime. [¶] A person is a victim if there's reason to believe that a federal or state crime is being or has been committed or attempted against him or her. [¶] It is not a defense that the defendant was not successful in preventing or discouraging the victim. It is not a defense that no one was actually physically injured or otherwise intimidated."

[19] See *People v. Galvez* (2011) 195 Cal.App.4th 1253, 1256 [126 Cal.Rptr.3d 554].

■   Defendants were not convicted of violating section 136.1, subdivision (c)(1). The jury did not find defendants used an implied or express threat of force in committing the crime. Therefore, the trial court erred in imposing a sentence of seven years to life pursuant to section 186.22, subdivision (b)(4)(C) because the section did not apply to the crime of which defendants were convicted and because the sentences imposed were based on a fact not found true by the jury. (*People v. Lopez, supra,* 208 Cal.App.4th at pp. 1064–1065.) We will vacate the sentences imposed pursuant to count 5 and remand the matters to the trial court for resentencing on that count.

### D.   The Terms Imposed for Extortion

Similarly, defendants contend the life terms imposed for the extortion convictions are not authorized because the jury did not find the crime of extortion was committed by means of fear induced by threat. They further argue the errors are not harmless.

In the first amended information, defendants were charged, in pertinent part, as follows: "COUNT 1 [¶] On or about January 31, 2010, in the County of Tulare, the crime of EXTORTION, in violation of . . . SECTION 520, a FELONY, was committed by [defendant] WOLFE and [defendant] ANAYA, who did unlawfully extort money and other property from [A.T.], by means of force and threat such as is mentioned in Section 519." The jury was instructed with CALCRIM No. 1830, Extortion by Threat or Force.[20]

Section 518 defines extortion as the "obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear . . . ." Section 519 defines fear for purposes of the crime of extortion: "Fear, such as will

---

[20] "The defendants are charged in Count ONE with extortion by threat or force in violation of . . . section 518.

"To prove that a defendant is guilty of this crime, the People must prove that:

"1. The defendant threatened to unlawfully injure or used force against another person or a third person;

"2. When making the threat or using force, the defendant intended to use that fear or force to obtain the other person's consent to give the defendant money or property;

"3. As a result of the threat or use of force, the other person consented to give the defendant money or property;

"AND

"4. As a result of the threat or use of force, the other person then gave the defendant money or property.

"The term *consent* has a special meaning here. Consent for extortion can be coerced or unwilling, as long as it is given as a result of the wrongful use of force or fear.

"The threat or use of force must be the controlling reason that the other person consented. If the person consented because of some other controlling reason, the defendant is not guilty of extortion.

"The threat may involve harm to be inflicted by the defendant or by someone else."

constitute extortion, may be induced by a threat . . . : [¶] 1. To do an unlawful injury to the person or property of the individual threatened . . . ." With regard to punishment for the crime of extortion, section 520 provides as follows: "Every person who extorts any money or other property from another, under circumstances not amounting to robbery or carjacking, by means of force, or any threat, such as is mentioned in Section 519, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 for two, three or four years."

Essentially, on appeal defendants argue that because the verdict forms specifically referenced section 518, rather than section 519, the sentences imposed are unauthorized. Defendants argue there exists a distinction between "means of force" and "means of a threat" for purposes of the applicability of either subdivision (b)(1)(C) or (b)(4)(C) of section 186.22.

Defendants were alleged to have committed the crime of extortion pursuant to section 518, although the information specifically references sections 519 and 520. Section 518 requires a finding of the use of force or fear induced by threat. The jury was instructed with CALCRIM No. 1830, which expressly provided the People must prove the defendants "threatened to unlawfully injure or used force" and "[w]hen making the threat or using force, the defendant intended to use that fear or force" to obtain consent, and that as "a result of the threat or use of force, the other person consented to give the defendant money or property," and that as a result of that same "threat or use of force" the victim gave the defendant money or property. The jury's verdicts found defendants guilty "as charged in Count 1 of the First Amended Information," "Extortion by Threat or Force . . . a violation of . . . section 518 . . . ." Here, too, the jury did not make the required factual findings pertaining to fear necessary to permit the trial court to impose the alternative sentence pursuant to section 186.22, subdivision (b)(4)(C).

■ A punishment of seven years to life is authorized "if the felony is extortion, as defined in Section 519." (§ 186.22, subd. (b)(4)(C).) We are not convinced, as argued by the People, that specific reference to section 519 instead of section 518 is a legislative oversight. Rather, the plain language of section 186.22, subdivision (b)(4)(C) is that it applies to criminal street gang threats that induce fear, such as will constitute extortion, "as defined in Section 519; or threats to victims and witnesses as defined in Section 136.1." It seems clear that this subdivision seeks to impose longer imprisonment for felony convictions for extortion and witness/victim intimidation when they are committed by criminal street gang members using felonious threats to commit these felonies. For that reason, we are also not persuaded by the People's assertion that defendants' interpretation of the statute is one that the "Legislature cannot have intended" for it would lead to "an absurd result." As

defendants contend in their reply brief, reserving the seven-year-to-life term for the crime of extortion that involves a threat comports with the Legislature's desire to punish that threat more harshly. The use of force only, on the other hand, could amount to nothing more than a battery. Therefore, we believe the Legislature intended extortion committed via a felonious threat to be treated more harshly than extortion by simple force.

Under *Apprendi*, the court could not properly impose sentences under this statute without findings by the jury that the elements were met. Because the jury was instructed on extortion under two theories—force or fear—and was not required to find that the extortion was based on threats inducing fear, it did not necessarily find this element true when it rendered its verdicts in count 1.

We cannot say the error in sentencing defendants under section 186.22, subdivision (b)(4)(C) was harmless beyond a reasonable doubt. Without a specific finding, we can only speculate which theory the jury accepted as true, or whether it accepted both theories. If we were to engage in such speculation, however, we would conclude it is unlikely the jury found the extortion conviction based on a threat inducing fear. Instead, the evidence established that the victim handed over the money in his possession after one of the perpetrators punched him in the face. This was also the theory the People argued to the jury. Consequently, the sentences imposed on count 1 must be vacated and the matter remanded for resentencing under section 186.22, subdivision (b)(1)(C).

E., F.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV., V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The convictions for receiving stolen property (§ 496, subd. (a); count 7) are reversed. Additionally, the matter is remanded for resentencing on count 5 (§ 136.1[24]) and count 1 (§ 518). The trial court is directed to amend the

---

*See footnote, *ante*, page 252.

[24] We note the abstract of judgment for defendant Anaya incorrectly refers to the statute as section 136.

In a petition for rehearing, defendant Wolfe for the first time asks this court to remand the matter for resentencing on count 8. He notes the analysis applied to count 5 applies with equal

abstracts of judgment as follows: As to defendant Anaya, (1) only a single reference to the prior serious felony enhancement pursuant to section 667, subdivision (a) should appear (delete the subsequent five references) and (2) delete all references to the section 667.5, subdivision (b) enhancement. As to defendant Wolfe, delete the references to the prior serious felony enhancement in regards to the determinate terms imposed in counts 4, 6, and 7. Also as to defendant Wolfe, the trial court is directed to consider on remand for resentencing the propriety of the sentence imposed on count 8. (See fn. 24, *ante*.) In all other respects, the judgments are affirmed.

Poochigian, Acting P. J., and Franson, J., concurred.

A petition for a rehearing was denied November 5, 2013, and the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied February 11, 2014, S214796.

---

force to count 8, which also charged a violation of section 136.1. Rather than grant the relief requested because the People have been given no opportunity to address this issue, we will direct the trial court on remand to consider the propriety of its sentence with respect to defendant Wolfe on count 8 in the first instance, in light of our discussion and analysis with respect to count 5.