[No. F062740. Fifth Dist. Aug. 22, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
FELIX LOPEZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Under California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, Factual and Procedural Summary, part III.A. of the Discussion, including the two introductory paragraphs under part III., and the Disposition are certified for publication.

COUNSEL

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Jeffrey Grant, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CORNELL, Acting P. J.—**

## INTRODUCTION

A jury convicted Felix Lopez (Lopez) of the murder of Michael Valles. The jury also found numerous enhancements true, resulting in a determinate sentence of eight years four months and an indeterminate sentence of 50 years to life.

Lopez contends his convictions must be reversed because the evidence was insufficient to support the verdict in several respects, and the trial court erroneously instructed the jury in two respects. We reject these contentions and affirm each of the convictions.

Lopez also argues the trial court erred when it sentenced him to an indeterminate term of 14 years to life for attempting to dissuade a witness from testifying, count 5. The trial court relied on Penal Code section 186.22, subdivision (b)(4)(C) to impose this sentence. (All further statutory references are to the Penal Code unless otherwise specified). As we shall explain, because the jury did not find the act committed by Lopez was accompanied by an express or implied threat of force, section 186.22, subdivision (b)(4)(C) is not applicable to this conviction. We thus will vacate the sentence on this count and remand the matter to the trial court for resentencing.

Finally, while this appeal was pending, the Supreme Court issued its opinion in *People v. Mesa* (2012) 54 Cal.4th 191 [142 Cal.Rptr.3d 2, 277 P.3d 743] (*Mesa*), which holds the sentence for a violation of section 186.22, subdivision (a) must be stayed pursuant to section 654 when the acts establishing the defendant willfully promoted, furthered, or assisted in any felonious criminal conduct by gang members is the same criminal conduct the defendant was convicted of and punished for in the trial. One part of the determinate sentence the trial court imposed on Lopez was a consecutive 16 months for violating section 186.22, subdivision (a), count 4. Because the only evidence presented at trial to support the necessary acts element was the other crimes of which Lopez was convicted and punished, the sentence on count 4 must be stayed. We will thus vacate the sentence on this count as well and remand the matter to the trial court for resentencing.

## FACTUAL AND PROCEDURAL SUMMARY

*Prosecution Evidence*

*Alonzo Gonzalez*[1]

Alonzo Gonzalez (Gonzalez) was the owner of Pushing Ink Tattoo Studio (the tattoo shop) in January 2004. In his younger days, Gonzalez was involved in gangs but dropped out about 16 years before when his son was born. He understood that when a gang labeled someone "no good," it meant someone was bad and could be beaten up or even killed. Similarly, when a gang put a "green light" on someone, it meant the person was "no good" and a gang member could attack this person.

Gonzalez met Paul Bargas when Bargas brought his girlfriend in for a tattoo. He also tattooed Bargas. Bargas became a friend and often would come to the tattoo shop. Gonzalez met Henry Wernicke when Wernicke came into the tattoo shop with Bargas.

In January 2004, Gonzalez went to the apartment of Daniel Lopez hoping to resolve a dispute between Daniel Lopez's girlfriend and Gonzalez's brother's girlfriend. Bargas, who was at the tattoo shop, followed Gonzalez to the apartment. As Gonzalez was talking with a woman in the doorway, Daniel Lopez said, "that's Paul Bargas. He's no good. Green light on Paul Bargas." Gonzalez told Bargas to leave. Daniel Lopez and two other men followed Bargas when he left.

---

[1] In the clerk's transcript, Alonzo's last name is spelled "Gonzalez"; in the reporter's transcript it is spelled "Gonzales." We will use the spelling taken from the information, which is "Gonzalez." We also will use this spelling for Gonzalez's mother's surname.

The next day Daniel Lopez came into the tattoo shop with Lopez. Gonzalez told the two he did not want his brother to have any problems with them. Lopez told Gonzalez that Bargas was "no good" and, if Gonzalez continued to be friends with Bargas, he also would be "no good." Lopez wrote his phone number on a piece of paper and told Gonzalez to call him if Bargas showed up at the tattoo shop.

The following day Gonzalez was in the tattoo shop with Mario Sanchez when Bargas and Wernicke arrived. A few minutes later Lopez and Michael Valles entered the shop. Valles took off his gloves and probably shook hands with Gonzalez. Valles then put out his hand to shake with Bargas. Bargas backed up, refusing to shake hands.

Lopez said, "That's Paul Bargas. He's no good." Gonzalez felt that something was going to happen, so he said they had to take it "somewhere else." Gonzalez saw Lopez make a movement with his hands towards the waistband of his pants. He then heard a gunshot from behind him. Gonzalez ran out of the tattoo shop, and as he was leaving, he heard numerous gunshots.

Gonzalez returned to the tattoo shop a few minutes after the gunshots stopped. The only person in the shop was Valles, who was lying on the floor. Gonzalez did not see any weapons on Valles at any time that day. Valles asked Gonzalez to help him up. Gonzalez told him to stay on the floor and he would call for an ambulance. Linda Gonzalez, Gonzalez's mother, appeared at the shop at that time.

In May 2005, Gonzalez was called to testify in this matter. He went to the courthouse with his mother and Mario Sanchez. He saw Lopez in the hallway, out of custody. When Lopez walked by Gonzalez, he heard Lopez and Lopez's sister say, "Fucking snitches." In the gang world, a snitch is the same thing as an informant, which is a bad thing.

*Linda Gonzalez*

Gonzalez is Linda Gonzalez's son. She lived across the street from the tattoo shop. She was in her kitchen when she heard shots being fired from in front of the tattoo shop. She left her apartment and saw Lopez coming from the direction of the tattoo shop. Lopez said he had been shot and was holding his abdomen. Linda Gonzalez ran across the street to the tattoo shop. Gonzalez was upset and crying.

Linda Gonzalez also heard the comments made by Lopez in the courthouse in May 2005. She heard Lopez and a female voice say, "Snitches, you shouldn't be here."

*Mario Sanchez*

Sanchez went to Gonzalez's tattoo shop about 5:00 p.m. on the day of the shooting. He was visiting with Gonzalez when Bargas and Wernicke arrived.

Sanchez went into the bathroom to clean some of the tattooing equipment. While he was doing so, he heard the front door open. Sanchez heard Valles say, "What's the matter? You don't shake hands?" Bargas responded, "I'm not going to shake your hand." Sanchez heard a voice ask, "Are you Paul Bargas?" Bargas denied that he was and then Lopez said, "That's Paul Bargas." A voice also said, "You're Paul Bargas. You're no good." Right after that Sanchez heard gunfire and he ran out the back door. As he was running out, he saw Bargas with two guns in his hands shooting downward. Police officers had arrived by the time Sanchez returned to the tattoo shop.

Sanchez also confirmed the comments that were made in the courthouse in May 2005. He heard Lopez say "snitches" as he, Gonzalez, and Linda Gonzalez walked by.

*Paul Bargas*

Bargas reviewed his criminal history, which began when he was about 15, and his gang involvement, which began shortly thereafter. He admitted he was a member of the Nortenos criminal street gang and associated with other gang members. Bargas explained that someone who informed on a fellow gang member to the police would be labeled "no good" and subject to consequences.

In 1998 Bargas was driving a vehicle and Jose Ochoa was the passenger. Ochoa shot a gun from the vehicle and injured a rival gang member. Bargas was arrested and identified Ochoa as a passenger in the vehicle at the time of the shooting. Bargas spent about nine months in the county jail, where he learned how to survive as a gang member.

In 2000, Bargas was arrested for false imprisonment. While in jail, he saw Lopez. Bargas was jumped by four or five Nortenos while he was sleeping in his cell. While the attackers were beating him, they were telling Bargas he was "no good" and he was a "rat" because he told on "Jose."

Bargas met Gonzalez in 1999 but became friends with him in 2003. Bargas would spend time at the tattoo shop, and Gonzalez told him he would teach him how to tattoo. Wernicke also was Bargas's friend, but he used drugs so he was not always around.

About two days before the shooting, Bargas was at the tattoo shop with Gonzalez and Sanchez. Gonzalez and Bargas went to an apartment complex across the street. As they walked up the stairs to an apartment, Bargas saw Daniel Lopez and two other men he did not know. Daniel Lopez said, "There's Paul Bargas. He's no good." Daniel Lopez also said there was a "green light" on Bargas, which means the same thing as "no good." Bargas understood the term "no good" to mean that he could be attacked, and even murdered, by other Nortenos.

The three men started spitting at Bargas, so he walked away. Bargas could tell the three wanted to fight. The three men followed Bargas into the parking lot in front of the tattoo shop. Bargas grabbed a screwdriver from his car to defend himself. One of the men hit Bargas on the head; Bargas stabbed Daniel Lopez in the arm with the screwdriver. Daniel Lopez told his friends that Bargas had a knife, so the three left.

Over the next two days Bargas heard many comments that the Nortenos were going to kill him because he was "no good" and because he had stabbed Daniel Lopez. Bargas decided to arm himself for protection; he obtained a .38-caliber handgun from a friend. He also had a .22-caliber handgun. He kept the guns in his pocket and attempted to "[lay] low" to avoid a confrontation.

Two days later Bargas had someone drop him off at the tattoo shop. Gonzalez and Sanchez were at the shop. Wernicke came in shortly after Bargas arrived. Bargas had the two guns with him.

About two minutes later, Valles and Lopez entered the tattoo shop. Bargas immediately thought the two were going to attack him. The two men split up in the shop. Valles said something to Gonzalez that Bargas did not hear. Lopez was pacing. Bargas was concerned about being attacked, but was waiting to see if anything would happen.

Valles approached Bargas and asked if he was Paul Bargas while extending his hand as if to shake hands. Bargas backed up because he knew that shaking hands was a trick that Nortenos used to distract the target of an attack. When Bargas did not answer, Lopez identified Bargas and said he was "no good." Bargas saw Lopez pull a gun from under his sweatshirt. Valles moved to grab his gun. Bargas thought his life was in danger so he began shooting. He shot Valles maybe four times. Bargas also shot at Lopez. Lopez aimed his gun at Bargas but then ran out the door. Valles said he was going to kill Bargas, so Bargas shot him again as he was lying on the floor.

Bargas ran out the front door to escape. He saw Lopez a short distance away. Lopez was running away and shooting at Bargas as he was running.

Bargas hid behind a truck and returned fire. Bargas was shot in the foot, but he managed to run away from the scene.

Bargas received treatment in San Diego because he did not want to be discovered in the area with a bullet wound. Bargas did not call the police, even though he believed he was defending himself.

Approximately seven months later, parole agents searched Bargas's home and discovered the two guns used in the shooting. Bargas pled guilty to being a felon in possession of a firearm and was sentenced to four years in prison. While in prison he was placed in protective custody at his request.

### Henry Wernicke

Wernicke was in custody at the time he testified. In exchange for his testimony, the prosecutor agreed to seek a reduced sentence and period of parole. Wernicke also was provided immunity for his testimony.

Wernicke grew up in the same neighborhood as Bargas, and the two were friends. He met Gonzalez at the tattoo shop about a month before the shooting.

Wernicke had a long criminal history, as well as many periods of confinement for offenses and parole violations. He admitted membership in the prison gang Nuestra Raza, which is affiliated with the Nuestra Familia prison gang.

One of the fundamental rules of gang membership is that no one can attack another gang member unless they have the permission of someone with status. Wernicke knew the gang had determined Bargas was "no good" and Bargas could be attacked at any time. He also knew that Daniel Lopez did not have the authority within the gang to order an attack on Bargas.

Wernicke met Valles while in jail. Valles appeared to be in a position of power in jail. Wernicke had not done any jail time with Lopez.

On the day of the shooting, Wernicke and Bargas were dropped off at the tattoo shop. Gonzalez and Sanchez were present when they entered. Three or four minutes later Lopez and Valles entered the shop and walked to separate locations. Wernicke was scared because he knew both Lopez and Valles had "status" in the gang, and they were after Bargas.

Wernicke tried to neutralize the situation by introducing himself to Lopez and Valles. Lopez and Valles were "staring" or "mad-dogging" Bargas. Valles

attempted to shake Bargas's hand, but Bargas backed away. Wernicke knew that Valles was attempting to neutralize Bargas by grabbing his hand so he could not defend himself. Valles appeared hostile and aggressive. Lopez was watching Bargas closely. Lopez then pulled a handgun from his waistband. Bargas pulled out his gun and the shooting started. Wernicke ran out the back of the tattoo shop.

Wernicke did not see Valles with a gun.

### Patricia and Lawrence Corona

At the time of the shooting, Patricia and Lawrence Corona were stopped at a traffic signal. They observed a man shooting a gun towards the tattoo shop. The man wore a hooded black sweatshirt and was moving away from the tattoo shop while firing his weapon. He appeared to hop in the air each time he shot the gun.

### Thomas Blake

Thomas Blake was a detective with the Modesto Police Department in January 2004 and was assigned to investigate the shooting. He located a blood trail that ran from the tattoo shop towards the apartments across the street. The blood trail ended at the apartment of Daniel Lopez. A search of the apartment located evidence of someone seriously wounded, as well as a .38-caliber semiautomatic gun magazine.

Blake visited Lopez in the hospital the day after the shooting. Lopez said he and Valles had gone into the tattoo shop to look at patterns. They were immediately engaged by a heavyset Hispanic male. This man said he knew Lopez and Valles. When Valles went to shake the man's hand, the man pulled a gun and started shooting at them. Lopez was shot as he tried to leave the shop. He collapsed on the sidewalk outside of the shop. Lopez denied possessing a firearm or shooting a firearm.

Blake testified that Bargas was of medium build, not heavyset, while Gonzalez would be considered heavyset.

### John Habermehl

Officer John Habermehl spoke with Lopez at the hospital shortly after Lopez was shot. Lopez stated that he was shot at the tattoo shop by an unknown male. He also asked about the condition of his friend, Valles.

### Forensic Evidence

Investigators recovered a .45-caliber handgun and eight .45-caliber shell casings in the street near the blood trail leading to Daniel Lopez's apartment.

Lopez's thumbprint was found on the magazine from the handgun. The eight recovered shell casings were fired from the handgun.

The bullets recovered revealed that at least two .38-caliber handguns were used during the firefight.

No evidence was recovered that would suggest a gun was fired from the front of the tattoo shop towards the area where Bargas was standing.

Valles was shot five times and died of blood loss due to those injuries. Shots to the chest and abdomen were both fatal wounds.

### Gang Evidence

The prosecution's theory of the case was that Valles and Lopez went to the tattoo shop to murder Bargas because Bargas was "no good." The prosecution's gang expert, Richard Delgado, testified that individuals who held leadership positions in the gang had an obligation to make an example out of gang members who had done something that resulted in a "green light" being put on them. By attacking the disfavored gang member, the leaders instill fear and intimidation on other gang members and the public in general, thereby benefitting the gang.

Delgado further opined that Lopez was an active member of the Nortenos criminal street gang, as was Daniel Lopez. Daniel Lopez, however, was not in a position of leadership within the gang.

### Defense Evidence

### Lawrence Brookter

Lawrence Brookter testified as a gang expert on behalf of Lopez. It appears the primary purpose of his testimony was to suggest that Delgado's testimony was incorrect in several respects. He, however, did not suggest that Lopez was not a member of the Nortenos, nor did he testify this crime was not committed for the benefit of the Nortenos.

### Felix Lopez

Lopez testified that when he was released from prison in about 1998, he attempted to avoid the gang lifestyle. He no longer associated with gang members and was staying out of jail.

When Lopez learned that Daniel Lopez had been stabbed by Bargas, he met with Gonzalez at the tattoo shop in an attempt to avoid further violence. Lopez thought they had resolved the dispute, but he wanted to bring by a friend that Gonzalez knew (Valles) to make sure the issue was resolved.

Lopez had spoken with Valles on the phone before, so he called him because he thought Valles knew Gonzalez. The two went to the tattoo shop to make sure there would not be any further problems. Lopez did not have a weapon, but he did not know if Valles was armed.

There were three men near the counter when Lopez and Valles entered the tattoo shop. Lopez and Valles shook hands with Gonzalez and Wernicke. Lopez admitted he knew Bargas, but did not recognize him in the tattoo shop. Lopez denied knowing there was a "green light" on Bargas or if the gang had labeled Bargas "no good."

Bargas shook his head and backed up when Valles offered to shake his hand. Wernicke asked Lopez if he was Diablo's brother. Lopez heard gunshots and saw Bargas had a gun in each hand and was shooting Valles. Valles fell to the ground with a gun in his hand. The gun fell out of Valles's hand and landed near Lopez's foot. Lopez grabbed the gun and tried to shoot at Bargas, but the gun was jammed.

Lopez was shot at least twice but ran out of the tattoo shop. He checked the clip in the gun to see if it had bullets and then put the clip back in the gun and kept running. He heard more gunshots, so he pulled the slide back on the gun and started shooting at Bargas, who was near the door of the tattoo shop. Lopez dropped the gun when the ammunition was exhausted. He ran to Daniel Lopez's apartment and was taken to the hospital.

Regarding the incident with Gonzalez at the courthouse, Lopez said he was at the courthouse because of the possession of a firearm charge. The hearing was moved from one department to another. He was upset because he did not want to be there and he was required to move from one department to the next. He said to his sister something like "This is a bitch." He was not attempting to intimidate anyone, nor did he realize that Gonzalez was nearby.

*The Charges*

An amended information charged Lopez with five counts: (1) the murder of Michael Valles (§ 187) (count 1), (2) discharge of a firearm at an occupied building (§ 246) (count 2), (3) being a felon in possession of a firearm (former § 12021.1) (count 3), (4) active participation in a criminal street gang (§ 186.22, subd. (a)) (count 4), and (5) attempting to dissuade a witness from

testifying (§ 136.1, subd. (a)(2)) (count 5). The information also alleged as enhancements that Lopez (1) committed the offense for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1) (counts 1, 2, 3, and 5), (2) suffered a prior conviction of a serious felony within the meaning of section 667, subdivisions (b) through (i) (all counts), (3) suffered a prior conviction of a serious felony within the meaning of section 667, subdivision (a) (all counts), (4) served two prior terms of imprisonment within the meaning of section 667.5, subdivision (b) (all counts), and (5) committed the crime while on bail for another offense within the meaning of section 12022.1 (count 5).

### Verdict and Sentence

The jury deliberated for three days before finding Lopez guilty of all charges and finding all enhancements true. Lopez admitted the prior conviction allegations. He was sentenced to a determinate term of eight years four months and a consecutive indeterminate term of 50 years to life.

## DISCUSSION*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. Sentencing

There are two sentencing issues. The first is raised by Lopez and relates to the sentence imposed for his conviction of attempting to dissuade a witness from testifying. The second arose when the Supreme Court recently issued its decision in *Mesa, supra,* 54 Cal.4th 191 and concerns application of section 654 when the defendant is convicted of active participation in a criminal street gang as well as other substantive offenses.

We begin with the sentence for Lopez's section 136.1 conviction.

### A. Sentence for section 136.1

Count 5 of the information charged Lopez with violating section 136.1, subdivision (a)(2), alleging that Lopez did "willfully, unlawfully, knowingly, maliciously, and feloniously attempt to prevent or dissuade ALONZO GONZALEZ, a

---

*See footnote, *ante,* page 1049.

witness, from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." The information charged as an enhancement that Lopez committed the offense "for the benefit of, at the direction of, or in association with a criminal street gang . . . with the specific intent to promote, further, or assist in any criminal conduct by gang members."

The verdict stated that the jury found Lopez guilty "of the offense of ATTEMPT TO PREVENT/DISSUADE WITNESS FROM TESTIFYING, [in] violation of Section 136.1[, subdivision] (a)(2) of the California Penal Code, a felony, as charged in Count V of the Information." The jury also found the enhancement true: "We further find the above crime was committed for the benefit of, at the direction of, or in association with a criminal street gang . . . with specific intent to promote, further, or assist in any criminal conduct by gang members, pursuant to Penal Code Section 186.22[, subdivision] (b)(1)."[5]

The trial court imposed a sentence of 14 years to life for the conviction. The base term was seven years to life, which was doubled because Lopez had suffered a prior "strike" conviction within the meaning of section 667.5, subdivision (d).

The issue is whether the trial court properly chose the base term of seven years to life. It appears, and the parties agree, that the trial court applied section 186.22, subdivision (b)(4)(C) to reach this result.

*Section 186.22, subdivision (b)*[6]

 Subdivision (b) deals with increased terms of imprisonment when the jury finds that a crime is committed for the benefit of a criminal street gang.

When applicable, subdivision (b)(1) imposes an additional term of imprisonment when a defendant is convicted of a felony and the jury determines the crime was committed for the benefit of a criminal street gang. It begins by stating, "Except as provided in paragraphs (4) and (5), any person who is convicted of a felony" committed for the benefit of a criminal street gang shall receive the following sentence enhancements: (1) an additional term of two, three, or four years if only the enhancement is found true (subd. (b)(1)(A)), (2) an additional term of five years if the felony is a serious felony as defined in section 1192.7, subdivision (c) (§ 186.22, subd. (b)(1)(B)), or

---

[5] For clarity's sake, we refer to this enhancement as "for the benefit of a criminal street gang."

[6] All undesignated subdivisions referred to under this subheading are to section 186.22.

(3) an additional term of 10 years if the felony is a violent felony as described in section 667.5, subdivision (c) (§ 186.22, subd. (b)(1)(C)).

Subdivision (b)(2) and (3) assists the trial court in determining which term of the sentencing triad should be imposed when the court has discretion to choose the additional term.

■ On the other hand, subdivision (b)(4) requires the trial court to impose a term of life in prison instead of the sentence otherwise required by law for the following crimes: home invasion (§ 213), carjacking (§ 215), felony shooting at an inhabited building (§ 246), infliction of great bodily injury while discharging a firearm from a vehicle in the commission of a felony (§ 12022.55), extortion (§ 519), and "threats to victims and witnesses, as defined in Section 136.1." (§ 186.22, subd. (b)(4)(B), (C).)

When imposing the indeterminate term of life in prison, the trial court must choose a minimum sentence that is the greater of two alternatives. The first alternative is the term that would otherwise be imposed pursuant to section 1170 for the underlying conviction, including any enhancements. (§ 186.22, subd. (b)(4)(A).)

The second alternative depends on the crime committed. The minimum term is 15 years if the crime is a home invasion (§ 213), carjacking (§ 215), felony shooting at an inhabited building (§ 246), or if the defendant inflicts great bodily injury while discharging a firearm from a vehicle in the commission of a felony (§ 12022.55). (§ 186.22, subd. (b)(4)(B).) The minimum term is seven years if the crime is felony extortion, or "threats to victims and witnesses, as defined in Section 136.1." (§ 186.22, subd. (b)(4)(C).)

To summarize, when a crime is committed for the benefit of a criminal street gang, subdivision (b) requires the trial court to impose either (1) a term of imprisonment in addition to the term otherwise imposed by law (subd. (b)(1)), or (2) a life term with a minimum term of imprisonment determined as explained in the preceding paragraphs if the crime is specifically identified in subdivision (b)(4).

In this case, the trial court relied on subdivision (b)(4)(C) to impose a term of seven years to life. Imposition of this sentence is permissible only if Lopez was convicted of "threats to victims and witnesses, as defined in Section 136.1." (*Ibid.*)

Lopez argues he was convicted only of attempting to dissuade a witness from testifying, not attempting to dissuade a witness from testifying *with threats*. The People assert that because the phrase "threats to victims and

witnesses" refers to section 136.1, any conviction of this offense permits imposition of the indeterminate sentence of life with a minimum term of seven years.

We now turn to section 136.1.

### Section 136.1[7]

■ Subdivision (a) provides that anyone who knowingly and maliciously prevents or dissuades, or attempts to prevent or dissuade, a witness or victim from testifying is guilty of an offense that may be punished as either a misdemeanor or a felony. (Subd. (a)(1), (2).) Subdivision (a) specifically names subdivision (c) as an exception to its provisions.

Subdivision (c) provides that every person who commits an act described in subdivision (a) where the act is accompanied by force or by an express or implied threat of force, committed in furtherance of a conspiracy, committed by one who previously has been convicted of violating this section, or is committed by one acting on behalf of another and is committed for pecuniary or other gain, is guilty of a felony punishable by imprisonment for two, three, or four years. (Subd. (c)(1)–(4).)

Thus, a defendant who attempts to dissuade a witness from testifying is guilty of either a misdemeanor or a felony, but, if the defendant's attempt is accompanied by an express or implied threat of force, he is guilty of a felony with an increased term of imprisonment.

■ The Sixth and Fourteenth Amendments to the United States Constitution preclude a trial court from imposing a sentence above the statutory maximum based on a fact, other than a prior conviction, not found to be true by a jury. (*Cunningham v. California* (2007) 549 U.S. 270, 274–275 [166 L.Ed.2d 856, 127 S.Ct. 856]; *Blakely v. Washington* (2004) 542 U.S. 296, 303–304 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [147 L.Ed.2d 435, 120 S.Ct. 2348].) Whether a defendant used an express or implied threat of force when attempting to dissuade a witness from testifying is a question of fact that subjects the defendant to a greater sentence. Accordingly, *Apprendi* and its progeny require the jury find this fact true beyond a reasonable doubt.

### Analysis

As explained, the information charged Lopez with violating section 136.1, subdivision (b)(2), knowingly and maliciously attempting to dissuade a

---

[7] All undesignated subdivisions referred to under this subparagraph refer to section 136.1.

witness from testifying. The information did not charge Lopez with using an express or implied threat of force. Nor did the instructions inform the jury it must find Lopez used an express or implied threat of force. Nor did the jury make a specific finding that Lopez used an express or implied threat of force.[8]

■ Section 186.22, subdivision (b)(4)(C) permits imposing a sentence of seven years to life only if the defendant makes "threats to victims and witnesses, as defined in Section 136.1." Only subdivision (c)(1) of section 136.1 refers to the use of an implied or express threat. Therefore, the plain meaning of section 186.22, subdivision (b)(4)(C) is that a seven-year-to-life sentence can be imposed only if the jury convicts the defendant of attempting to dissuade a witness by use of an implied or express threat of force pursuant to section 136.1, subdivision (c)(1).

■ Lopez was not convicted of violating section 136.1, subdivision (c)(1). Nor did the jury find Lopez used an implied or express threat of force in committing the crime. Therefore, the trial court erred in imposing a sentence of seven years to life pursuant to section 186.22, subdivision (b)(4)(C) because the section did not apply to the crime of which Lopez was convicted and because the sentence was based on a fact not found true by the jury. We will vacate the sentence on count 5 and remand the matter to the trial court for resentencing on that count.

B. *People v. Mesa*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The convictions are affirmed. The sentences on counts 4 (active participation in a criminal street gang, § 186.22, subd. (a)) and 5 (attempting to

---

[8] The jury instruction on count 5 was read to the jury as follows: "The defendant is charged in Count 5 with intimidating a witness in violation of Penal Code Section 136.1. To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant maliciously tried to prevent or discourage Alonzo Gonzale[z] from attending or giving testimony at a preliminary hearing. Two, Alonzo Gonzale[z] was a witness. And, three, the defendant knew he was trying to prevent or discourage Alonzo Gonzale[z] from attending or giving testimony at a preliminary hearing and intending to do so. [¶] A person acts maliciously when he or she unlawfully intends to annoy, harm, or [injure] someone else in a way—in any way or intends to interfere in any way with the [orderly] administration of justice. [¶] As used here, a witness means someone who knows about the existence or nonexistence of facts relating to a crime. It is not a defense that the defendant was not successful in preventing or discouraging the witness. It is not a defense that no one was actually [physically] injured or [otherwise] intimidated."

[*]See footnote, *ante*, page 1049.

dissuade a witness from testifying, § 136.1) are vacated and the matter is remanded to the trial court for resentencing on these counts.

Gomes, J., and Franson, J., concurred.

On September 4, 2012, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 20, 2012, S205695.