Filed 12/23/14  P. v. Rosales CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B251389 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA126989) |
| v. | |
| DENNIS ALFREDO ROSALES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Sean D. Coen, Judge.  Affirmed in part and reversed and remanded in part.

Kimberly Howland Meyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In a four-count amended information filed by the Los Angeles District Attorney, defendant and appellant Dennis Alfredo Rosales was charged as follows:  In <u>count I</u>, defendant was charged with making criminal threats in violation of Penal Code section 422, subdivision (a),[1] a serious felony within the meaning of section 1192.7.  In <u>count II</u>, he was charged with dissuading a witness from reporting a crime, in violation of section 136.1, subdivision (b)(1), a serious felony within the meaning of section 1192.7, subdivision (c)(37).  It was further alleged as to count II, inter alia, that a principal used a firearm, within the meaning of section 12022.53, subdivision (b), and that the offense was committed for the benefit of a gang, pursuant to section 186.22, subdivision (b)(4).  In <u>count III</u>, defendant was charged with assault with a firearm, in violation of section 245, subdivision (a)(2).  And, in <u>count IV</u>, defendant was charged with attempted extortion, in violation of section 524.  It was further alleged as to counts I, III, and IV that defendant personally used a firearm, within the meaning of section 12022.5, subdivision (a), causing the offenses to become serious felonies (§ 1192.7, subd. (c)(8)) and violent felonies (§ 667.5, subd. (c)(8)), and that the offenses were committed for the benefit of a gang pursuant to section 186.22, subdivision (b)(1)(B).  It was further alleged pursuant to section 186.22, subdivision (b)(1)(C), as to all counts that the offenses were committed to benefit a gang.[2]

Defendant pleaded not guilty and denied the special allegations.

Trial was by jury.  Defendant was found guilty as charged and the special allegations were found true.

Defendant's motion for a new trial was denied.  Defendant was sentenced to serve a total of 32 years four months in state prison and a consecutive term of life in prison,

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    Section 186.22, subdivisions (b)(1)(B) and (C) set forth alternate punishments for persons convicted of a felony committed for the benefit of a gang.  Under subdivision (b)(1)(B), "If the felony is a serious felony, as defined in subdivision (c) of Section 1192.7, the person shall be punished by an additional term of five years."  Under subdivision (b)(1)(C), "If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years."

calculated as follows: (1) <u>Count I</u>: The midterm of two years, plus 14 years, which included 10 years for the section 186.22, subdivision (b)(1)(C), finding and four years for the section 12022.5, subdivision (a), finding, with the sentence as to count I stayed pursuant to section 654; (2) <u>Count II</u>: Life in state prison pursuant to section 186.22, subdivision (b)(4), plus 10 years pursuant to section 12022.53, subdivision (b), with the sentence to be served consecutive to the term imposed as to count III; (3) <u>Count III</u>: The midterm of three years in prison, plus four years pursuant to section 12022.5, subdivision (a); and (4) <u>Count IV</u>: A consecutive five years four months in prison, consisting of eight months (one-third of the midterm of 24 months), plus one year four months (one-third of the midterm) pursuant to section 12022.5, subdivision (a), plus three years four months (one-third of the midterm) pursuant to section 186.22, subdivision (b)(1)(C). Defendant was given 458 days of custody credits, which included 399 days of actual custody and 59 days of good time/work time.

Defendant timely appealed. On appeal, he argues: (1) The trial court erred in denying his motion for a new trial based upon the admission of gang evidence; (2) The true findings on the gang enhancement are based upon insufficient evidence; (3) The consecutive life sentence on count II based upon the true finding on the gang enhancement constitutes cruel and unusual punishment; (4) Defendant's conviction on count II for violation of section 136.1, subdivision (b)(1), does not qualify for a life sentence under section 186.22, subdivision (b)(4); (5) Defendant's conviction on count II does not qualify for the 10-year enhancement under section 12022.53, subdivision (b); and (6) The sentence enhancements on counts I, III, and IV under section 12022.5, subdivision (a), and section 186.22, subdivision (b)(1)(C), violate the prohibition under section 1170.1, subdivision (f), against imposing two or more enhancements for using a firearm in the commission of a single offense.

We agree with defendant that there were sentencing errors. Defendant's sentence on all counts is reversed and the matter is remanded for resentencing. In all other respects, we affirm.

3

**FACTUAL AND PROCEDURAL BACKGROUND**

I. *Prosecution Evidence*

    A.  <u>Evidence of the Charged Crimes</u>

Luis Reynoso (Reynoso) lived across the street from the 107th Street Elementary School. Gang graffiti was on the walls in front of the school, and MS-13 tagging was also on the trees and ground in the gang's territory. One wall had "Travieso" written on it. Also on the wall was "Centrales," a clique of the MS-13 gang. On the sidewall of the elementary school was graffiti, which read: "MS-13, Centrales, Travieso."

Reynoso, his mother (Victoria Tapia (Tapia)), and his brothers (17-year-old J., 14-year-old F., and seven-year-old E.) had all lived together in the house for seven years. Reynoso and J. did not really get along because when J. was 16 years old, he started hanging out with people from the "MS gang." Reynoso knew from watching documentaries on television that "MS" stood for "Mara Salvatrucha." Reynoso was not in a gang, but had been asked many times to be part of a gang. He had previously come across about nine MS-13 gang members in the neighborhood. J. was not a member of the gang, but once he started hanging out with gang members, he treated Reynoso like "some sort of a punk, like scared."

Reynoso attended John Muir Continuation School in Inglewood and he worked carpeting at his "Auntie's friend." He was paid by the job.

On the night of July 7, 2012, Reynoso was away from home with his girlfriend. Tapia, F., and E. were also not at home. When Reynoso returned home, sometime between 9:00 p.m. and 10:00 p.m., it was dark. But, he noticed J. sitting with defendant and another male across the street at the elementary school. Defendant was known as "Travieso" and "Menace," and the names meant "troublemaker, like a menace to society." Defendant had previously told Reynoso that he was from the MS gang. Reynoso had previously observed defendant pull up his shirt and flash to Reynoso an identifying "M.S." gang tattoo on his stomach. Reynoso had seen the tattoo several times on prior occasions. And, Reynoso had heard defendant say that he was a member of the

4

Centrales clique in the MS-13 gang. Moreover, prior to that night, Reynoso had seen defendant with a gun "a bunch of times."

Reynoso then heard defendant yell his name. Reynoso did not turn around; he opened the front gate to his yard and entered the front yard. The three males then approached him and entered the front yard. As he approached the back door of the house and was standing in the back driveway, defendant turned Reynoso around and asked, "Don't you hear me calling you?" Reynoso replied that he did not want to listen or talk to him. Defendant then told Reynoso to go to the front of the house. Reynoso was scared and complied with defendant's directions.

As they went to the front yard, defendant said he was from J.'s gang and asked Reynoso what was wrong with him, why he was acting differently, referring to the fact that Reynoso was ignoring them and not looking or paying attention to them. Reynoso responded that he did not want any part of what they were doing. At that point, defendant was directly in Reynoso's face, about a foot away; J. was on defendant's right side, and the third male was on defendant's left side. Defendant became angry, pulled out a gun in his left hand, pointed it, pressed it against Reynoso's chest, and then threatened that if Reynoso did not give him $100 by Monday, he would kill him. J. said nothing and did not look scared. Defendant said that if Reynoso called the police or told his mother or anyone, he would kill him. The gun was black metal and looked like a .45-caliber gun, like the kind of weapon police officers carry.

Defendant said that he was "taxing" Reynoso because "this [was] his hood" or this was "MS hood," repeating that Reynoso had "better have the money by Monday" and that if he told anyone, he would kill him. Defendant pointed the gun and pressed it to Reynoso's chin. Defendant lifted his shirt, displayed an MS-13 gang tattoo and said that he "ain't playing."[3] Defendant held the gun to Reynoso's chin for about three minutes.[4]

---

[3] On redirect examination, Reynoso testified that his testimony at the preliminary hearing (that he did not see the tattoo on this occasion) was untrue and that he did see it that night for "a couple of seconds when [defendant] flashed it."

Reynoso was scared for his life and believed that defendant would kill him if he told anyone or if he failed to give him the money by Monday.

With his right hand, defendant searched through Reynoso's pockets. He removed Reynoso's wallet and saw that there was no money in it. He grabbed Reynoso, removed and held up Reynoso's identification, and said, "'I'm going to need this.'" Defendant then returned the wallet to Reynoso's pocket. Although Reynoso believed that defendant took his identification card, he later discovered that his identification had been put back into his wallet.

Meanwhile, J. and the other male were quietly looking at Reynoso.

When defendant was finished, he, J., and the third male went back across the street to the elementary school.

Reynoso went inside the house. He was terrified and did not know what to do. He called his mother and asked her to "come home as soon as [she could]."

Reynoso did not call the police; he was scared and "they were right in the front."

Tapia returned home about 30 minutes later. He told her what had happened. He told her about the gun and how it had been placed against his chest. Tapia called the police.

B. <u>Initial Police Interview with Reynoso</u>

The police arrived 15 to 20 minutes later. When they arrived, Tapia went outside and Reynoso remained in the kitchen. The police then entered the home and spoke to Reynoso for about eight minutes. Reynoso told the police everything that had happened. As he spoke to them, he could see that defendant, J., and the other male had left. After he finished talking to the police, Reynoso was "still scared for [his] life."

C. <u>Defendant Returns to Reynoso</u>

On Monday, Reynoso was home with Tapia and his brothers F. and E. At around noon, Reynoso was inside the house when he saw defendant walking across the street,

---

**4** On redirect examination, Reynoso testified that he could be mistaken about how long the gun was pointed at his face.

6

around the school.  He did not have the $100 to give to defendant.**5**  He was scared. Tapia called the police.

Reynoso was so scared that he did not leave the house for about four days.  He did not see his brother J. until over a month later.

D.  Detective's Interview with Reynoso

About a week later, Detective Freddy Lilomaiava of the Los Angeles Police Department went to the house and spoke to Reynoso.  Reynoso told him what had happened on July 7, 2012.  At that time, Reynoso gave more information than he had given to the police originally, including the names defendant went by and an address where defendant lived at the time.  Detective Lilomaiava showed Reynoso a set of photographs.  Reynoso could not identify the person who had threatened him from any of the first set of photographs and so told the detective.  Detective Lilomaiava returned two days later with another set of photographs and admonished Reynoso.  Reynoso circled defendant's photograph and wrote, "I was shown line-up 270253 and I picked number 3. He threatened to kill me with a gun."

E.  Reynoso Appears in Court

In October 2012, Reynoso appeared in court to testify in response to a subpoena. He did not want to go to court to testify because he did not want his family to get hurt.

Reynoso also appeared in court to testify in November 2012.  He testified truthfully for about half of a day.  After that, he did not want to testify again because he was told that he was finished testifying and because he was scared about what happens to a "snitch" or a "rat" who testifies.  Reynoso was asked to return to court in January.  He did not want to go and went to his auntie's house in Palmdale for about a month.  He hoped that it would all be over by then and that he could then return home.  While in Palmdale, Tapia tried to convince Reynoso to testify.  He did not want to go to court.

---

**5**      On redirect examination, Reynoso testified that he saw defendant again that same evening.  He was walking around and looking directly at Reynoso's house.

After January 2013, Reynoso returned home.  He learned that he was needed back in court to testify, when he was arrested for a "body attachment."  Reynoso remained in jail for 15 days until he testified at defendant's trial.

F.  Briefing of Police Officers

On July 27, 2012, Los Angeles Police Officers Kenneth Price and David Sanchez were briefed at the station about defendant.  Gang detectives told them about a man who had committed the crime of criminal threats.  Later, Detective Romero followed up by showing them a booking photo of defendant and providing a "basic physical description," including a "prominent tattoo on his abdomen with the M.S. and also a moniker that he used at the time, Travieso."  They were also given the address of an area where he might be found.

After the briefing, the officers left the station and saw two male Hispanics, one of whom met the description given at the briefing.  They approached the two men and asked them to turn around.  While sweeping defendant's back, Officer Price asked whether he had any tattoos and whether he was affiliated with a gang.  Defendant admitted that he was affiliated with the MS-13 gang and said that his gang moniker was "little Downer." Officer Price asked defendant if he also went by the gang moniker "Travieso," and defendant replied that he did.[6]  Defendant was then placed in handcuffs.  He had "M.S." tattooed on his abdomen.  The other suspect detained with defendant was J.

G.  Gang Evidence

Los Angeles Police Department Officer Edgar Muro testified as a gang expert.  He stated that the MS-13 gang was one of the primary gangs he was assigned to monitor.  It commits murders, attempted murders, extortions, robberies, human trafficking, drug sales, drug possession, and gun possession.  The gang benefits by individual gang members committing crimes.  The primary purpose of the MS-13 gang is to expand its territory and to make money by selling drugs and committing extortion, signature crimes of this gang.  Some of the money obtained by individual gang members committing

---

[6]    Gang members usually have more than one gang moniker.

8

crimes is shared by the gang as a whole, and eventually a third of it is supposed to go to the Mexican Mafia, a prison-based gang. MS-13 uses its share of the money to buy weapons and additional drugs to sell. Some gang members have jobs, while others rely on the gang for support. Unlike other gangs, the MS-13 gang has no alliances and has fought over territory with every other gang.

"M.S." stands for "Mara Salvatrucha." Mara is supposed to stand for "large crowd," "Salva" refers to El Salvador or El Salvadorian, and "Trucha" means "being on the look-out" or aware of your surroundings. The "13" in the gang name stands for the 13th letter of the alphabet, "M," which refers to the Mexican Mafia. The MS-13 gang historically had a violent war with the 18th Street gang, and the Mexican Mafia brokered a peace agreement whereby the two gangs split up MacArthur Park and the drug sales.

There are thousands of members of MS-13. The majority of its members are from El Salvador. Some were raised in Los Angeles.

There are many cliques in the MS-13 gang.

"Putting in work" for the MS-13 gang included committing different crimes. Crimes were committed by gang members in order to prove oneself and earn respect.

Gang members wanted to be feared. Officer Muro explained that it was important to the gang that community members fear them "because they're less likely to call the police or report" crime. Fear could be generated by anything from graffiti to actual threats to assault or murder. Officer Muro had seen a gang member follow through on such threats.

Officer Muro testified that taxing was another word for extortion, and that MS-13 was known for taxing people.

Next, Officer Muro stated that defendant was a documented member of the MS-13 gang. He had an MS tattoo on his stomach, a rosary tattoo on the back of his hand and down his middle finger with a small "13" alongside it, an "L.A." tattoo on his left upper arm, and a tattoo reading "So What." The "S" and "W" when looked at upside down looked like the letters "MS."

Finally, when given a hypothetical of the facts of the instant case, Officer Muro opined that the crimes were committed for the benefit of the MS-13 gang.

II. *Defense Evidence*

Defendant did not testify.

## DISCUSSION

I. *The trial court properly denied defendant's motion for a new trial*

Defendant contends that the trial court erred by (1) allowing Reynoso to testify about his knowledge of the MS-13 gang, and (2) permitting the prosecution's expert witness to offer expert testimony about gangs and the MS-13 gang.

A. Standard of Review

We review a trial court's order denying a motion for new trial for abuse of discretion. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1159, overruled in part on other grounds in *People v. Rundle* (2005) 43 Cal.4th 76, 151, disapproved in part on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421.)

B. Reynoso's Testimony

The trial court did not err in admitting Reynoso's testimony. As detailed above, Reynoso testified about what he knew of the MS-13 gang, gang culture, and defendant. This testimony was relevant as it related to the gang enhancements charged and to Reynoso's credibility, bias, and fear. (*People v. Farnam* (2002) 28 Cal.4th 107, 153.) Thus, there was no error.

C. Expert Witness Testimony

The gang expert's testimony was also properly admitted. Again, defendant was charged with enhancements, and a qualified gang expert may testify to a wide variety of matters. (*People v. Ochoa* (2001) 26 Cal.4th 398, 438–439.) Gang culture and habits, which were relevant issues in this case, are matters not within the common knowledge of a jury; thus, they were matters proper for expert testimony. (*People v. Gardeley* (1996) 14 Cal.4th 605, 617.)

As set forth above, that is exactly the sort of evidence that Officer Muro offered. It follows that the trial court did not err in admitting his expert testimony.

D. Harmless Error

Even if the trial court had erred by allowing either Reynoso's testimony or Officer Muro's testimony, or both, any error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 and *Chapman v. California* (1967) 386 U.S. 18, 24. As set forth above, there was overwhelming evidence of defendant's gang membership; their testimonies were relevant to the enhancement and charges; and the jury was properly instructed. It follows that even if there had been error, such error was harmless. (*People v. Jablonski* (2006) 37 Cal.4th 774, 823.)

E. Due Process

Finally, we reject defendant's due process argument. It is well-settled that "the admission of evidence, even if error under state law, violates due process only if it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 436.) There is no indication here that defendant's trial was "fundamentally unfair." (*Ibid*.)

II. *The gang enhancement is supported by sufficient evidence*

Defendant argues that, despite his claim about the prejudicial nature of the gang evidence admitted, there was insufficient evidence to support the true finding on the gang enhancement.

A. Standard of Review

As the parties agree, we review the record for substantial evidence. (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60.)

B. Sufficient Evidence

As set forth above, there was overwhelming evidence that defendant committed his crimes to further benefit his gang. He identified himself as a gang member and attempted to use his gang status when demanding money from Reynoso. This evidence, coupled with the gang expert's testimony, was more than enough to support the true finding on the gang enhancement.

III. *The matter must be remanded for resentencing on count II*

In count II, defendant was charged with dissuading a witness in violation of section 136.1, subdivision (b)(1). The information also alleged a gang enhancement,

11

under section 186.22, subdivision (b)(4). The jury convicted defendant of the charged offense and found true the gang enhancement. He was sentenced to life in prison plus 10 years, with the sentence to be served consecutive to the term imposed on count III. On appeal, defendant contends that his conviction of section 136.1, subdivision (b)(1), does not qualify for a life sentence under section 186.22, subdivision (b)(4), because he was neither charged with or convicted of making a threat of force to Reynoso. We agree.

Section 186.22, subdivision (b)(4), provides that "[a]ny person who is convicted of a felony enumerated in this paragraph committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, be sentenced to an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greater of: [¶] . . . [¶] (C) Imprisonment in the state prison for seven years, if the felony is . . . threats to victims and witnesses, as defined in Section 136.1."

Here, the trial court relied on section 186.22, subdivision (b)(4), to impose a life sentence. Imposition of this sentence is permissible only if defendant was convicted of "threats to victims and witnesses, as defined in Section 136.1." (§ 186.22, subd. (b)(4)(C).) Defendant maintains he was convicted only of attempting to dissuade a witness from testifying, not of attempting to do so with threats. The Attorney General asserts that the phrase "threats to victims and witnesses" refers to section 136.1 generally, and that any conviction under this statute permits imposition of the indeterminate sentence.

Section 136.1 defines certain offenses involving persuading, preventing or attempting to persuade or prevent a witness or victim from reporting a crime or testifying at trial. Section 136.1, subdivision (a), prohibits a person from knowingly and maliciously preventing or dissuading a witness or victim from attending or testifying at trial, or attempting to do so. Subdivision (b) prohibits preventing or dissuading a witness or victim from (1) reporting a crime, (2) causing an accusatory pleading to be sought and prosecuted, or (3) arresting or seeking the arrest of any person in connection with the

12

crime. Both subdivisions (a) and (b) offenses are "wobblers," i.e., permitting either a jail or prison sentence. Subdivisions (a) and (b) each carves out subdivision (c) as an exception to its provisions.

Section 136.1, subdivision (c), necessarily elevates a violation of either subdivision (a) or (b) into a felony if "(1) . . . the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person." A violation of section 136.1, subdivision (a) or (b) is a lesser offense of subdivision (c), because subdivision (c) requires a violation of subdivision (a) or (b) plus the use of force or threat. (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1321; *People v. Brenner* (1992) 5 Cal.App.4th 335, 340–341.) "[A] defendant who attempts to dissuade a witness from testifying is guilty of either a misdemeanor or a felony, but [when that] attempt is accompanied by an express or implied threat of force, [the defendant] is guilty of a felony with an increased term of imprisonment." (*People v. Lopez* (2012) 208 Cal.App.4th 1049, 1064 (*Lopez*).)

"The Sixth and Fourteenth Amendments to the United States Constitution preclude a trial court from imposing a sentence above the statutory maximum based on a fact, other than a prior conviction, not found to be true by a jury. (*Cunningham v. California* (2007) 549 U.S. 270, 274–275 [127 S.Ct. 856, 166 L.Ed.2d 856]; *Blakely v. Washington* (2004) 542 U.S. 296, 303–304 [124 S.Ct. 2531, 159 L.Ed.2d 403]; *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [120 S.Ct. 2348, 147 L.Ed.2d 435] [(*Apprendi*)].) Whether a defendant used an express or implied threat of force when attempting to dissuade a witness from testifying is a question of fact that subjects the defendant to a greater sentence. Accordingly, *Apprendi* and its progeny require the jury find this fact true beyond a reasonable doubt." (*Lopez, supra*, 208 Cal.App.4th at p. 1064.)

Here, defendant was charged with violation of section 136.1, subdivision (b). The jury was not asked to find, and therefore did not find, that he used force or violence (or threatened to use force or violence) in the commission of the offense. Section 186.22, subdivision (b)(4)(C), permits imposition of a life sentence only when the underlying offense is a felony involving "threats to victims and witnesses, as defined in Section

136.1." Absent a jury finding of an express or implied threat of force pursuant to section 136.1, subdivision (c), defendant's conviction does not qualify for a life sentence under section 186.22, subdivision (b)(4)(C). (*Lopez*, *supra*, 208 Cal.App.4th at p. 1065; see also *People v. Anaya* (2013) 221 Cal.App.4th 252, 269–270.)

Relying on *People v. Neely* (2004) 124 Cal.App.4th 1258 (*Neely*), the Attorney General argues that the reference to "section 136.1" in section 186.22, subdivision (b)(4)(C), is not limited to any particular subdivision of that statute, and should be construed as including all the offenses set forth in section 136.1. We disagree. In *Neely*, the defendant argued that a prior conviction of violating section 136.1, subdivision (a)(2), did not qualify as a serious felony under section 1192.7, subdivision (c)(37). Section 1192.7, subdivision (c)(37), defines "intimidation of victims or witnesses, in violation of Section 136.1" as a serious felony. Noting that no specific offense in section 136.1 mentions "intimidation," *Neely* concluded that the phrase "intimidation of victims or witnesses" in section 1192.7, subdivision (c)(37), merely described the entirety of section 136.1. (*Neely*, at p. 1266.)

But section 186.22, subdivision (b)(4)(C), differs from section 1192.7, subdivision (c)(37). We conclude that the requirement of force or threat in section 136.1 is specifically limited to violations of subdivision (c), which explicitly and unambiguously creates a statutory distinction between offenses that require force or threat and offenses that do not. We recognize that at least one court has found that, in enacting section 186.22, subdivision (b)(4), the Legislature intended dramatically to increase punishment for all gang-related offenses, including the "wobbler" of ordinary attempted witness dissuasion.[7] (*People v. Galvez* (2011) 195 Cal.App.4th 1253, 1256.) But we cannot ignore the clear language of sections 186.22, subdivision (b)(4)(C) and 136.1.

---

[7] In *People v. Galvez*, *supra*, 195 Cal.App.4th 1253, the defendant was convicted of attempted witness dissuasion (§ 136.1, subd.(b)(1)), and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)), and the jury found both offenses were committed for the benefit of or in association with a criminal street gang (§ 186.22, subds. (b)(1), (b)(4)(C)). (*Galvez*, at pp. 1256–1257.) There, in contrast with the instant

14

In addition, as we observed above, any other interpretation of these statutes raises problems under *Apprendi*, which requires that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum . . . be submitted to a jury, and proved beyond a reasonable doubt." (*Blakely v. Washington, supra,* 530 U.S. at p. 409.) The jury was not asked if defendant violated section 136.1, subdivision (c). In *Apprendi*'s terms, subdivision (c) does not describe a sentencing factor applicable to a violation of subdivision (a). Rather, section 136.1, subdivision (c), describes a greater offense and provides for a more severe punishment than is authorized for a conviction under subdivision (a). The trial court relied on section 186.22, subdivision (b)(4), when it imposed a term of life on count II. That sentence was permissible only if defendant was convicted "of attempting to dissuade a witness by use of an implied or express threat of force pursuant to section 136.1, subdivision (c)(1)." (*Lopez, supra,* 208 Cal.App.4th at p. 1065.) Defendant was not convicted of violating section 136.1 subdivision (c)(1). It follows that the trial court erred in imposing a sentence under section 186.22, subdivision (b)(4)(C), because that section does not apply to the crime of which defendant was convicted, and was based on a fact that the jury did not find true.

The matter must be remanded to the trial court for resentencing on count II.[8]

---

action, the attempted witness dissuasion involved a physical assault by the defendant and other gang members, who punched the victim in the face, and kicked him in the head, side and leg. (*Id*. at p. 1257.) *Galvez* did not address the issue here, whether section 186.22, subdivision (b)(4)(C), was limited to violations of section 136.1 involving force or threat. Rather, the only legal question raised was whether section 136.1, subdivision (b)(1), was intended only to cover the prevention or dissuasion of someone from reporting a crime of which they were a victim. (*Galvez*, at p. 1258.) It is axiomatic that a case is not authority for a proposition it does not address. (See *People v. Knoller* (2007) 41 Cal.4th 139, 155 ["'An appellate decision is not authority for everything said in the court's opinion but only "for the points actually involved and actually decided."'"].)

[8]    It follows that we need not address defendant's contention that his sentence on count II is an unconstitutional cruel and/or unusual punishment. We also do not address defendant's argument that the trial court erred when it imposed a 10-year enhancement on count II.

IV. *The matter must be remanded for resentencing as to counts III and IV*

Defendant argues that the sentences imposed on counts I, III, and IV must be reversed because the substantive offenses in those counts were not violent felonies; they only became violent felonies because of the true findings on the section 12022.5, subdivision (a), firearm use enhancement. Because he was therefore punished "under two different sentence enhancement provisions for use of a firearm in a single offense," defendant argues that his sentence violates the prohibition against such dual use under section 1170.1, subdivision (f).

The People agree with defendant as to counts III and IV, and so do we. Because the trial court imposed and executed sentences pursuant to sections 12022.5, subdivision (a), and 186.22, subdivision (b)(1), based upon his personal firearm use, these counts must be remanded for resentencing.[9] (See *People v. Rodriguez* (2009) 47 Cal.4th 501, 509.)

V. *The matter must be remanded for resentencing as to count I*

As set forth above, the trial court stayed defendant's sentence as to count I pursuant to section 654. In so doing, the trial court stated that "[t]he stay would be permanent upon successful completion of the sentence in count" II.[10] Because we are reversing defendant's sentence on counts II, III, and IV and remanding the matter for resentencing, we likewise reverse and remand the matter for resentencing on count I.

---

[9]    We decline the People's request to simply modify the sentence on appeal. There are sentencing options available, including under section 12022.5, subdivision (a), or section 186.22, subdivisions (b)(1)(B) or (C), or both. Because the trial court has discretion to restructure defendant's sentence, remand is appropriate. (*People v. Rodriguez*, *supra*, 47 Cal.4th at p. 509.)

[10]    We note that the trial court's minutes indicate that the sentence as to count I was stayed and that the stay would "become permanent upon successful completion of the sentence in counts" II and IV.

## DISPOSITION

The sentence imposed on all counts is reversed, and the matter is remanded for resentencing.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                ASHMANN-GERST

We concur:


_____, P. J.
        BOREN


_____, J.
        HOFFSTADT